## A04A0993. WELDON v. THE STATE.
### (606 SE2d 329)

MIKELL, Judge.

A jury convicted James Weldon of three counts of child molestation and one count of statutory rape following an incident involving his former girlfriend's eleven-year-old daughter, S. S. The court sentenced him to 60 years in confinement. Weldon appeals the denial of his motion for new trial, arguing that he was deprived of an impartial jury, that the victim's uncorroborated testimony is insufficient to support his conviction for statutory rape, and that the trial court erred by allowing the state, over objection, to ask leading questions on direct examination. We disagree and affirm.

Viewed in the light most favorable to the verdict, the record shows that on the evening of June 15, 2000, while S. S.'s mother was out, S. S. called Weldon and asked him to come pick her up. He agreed. S. S. testified that she called Weldon because she was lonely, "looked at him as a father figure," and had not seen him in a long time. S. S. left a note for her mother saying that she was going to a friend's house. Weldon picked up S. S. and took her to his apartment. When S. S.'s mother called looking for her, Weldon told her that S. S. was not there. S. S. then went to sleep. The following morning, S. S. and Weldon started wrestling and, according to S. S., "one thing led to another." S. S. testified that Weldon first "pop kissed" her and then "french kiss[ed]" her, putting his tongue in her mouth. S. S. and Weldon then hugged, removed their clothes, and had sexual intercourse. S. S. testified that she was scared, but that she wanted to take off her clothes. S. S. then testified that Weldon first lay on top of her and "stuck his penis in [her] vagina." Weldon then told S. S. to turn over on her stomach. After S. S. complied, Weldon "put his penis back in [her] vagina" and then "came on [her] back." S. S. agreed not to tell anyone about the incident, and Weldon took her home.

S. S.'s mother testified that after S. S. came home later that day, S. S. told her mother that she had had intercourse with Weldon. S. S.'s mother then took S. S. to the hospital.

Sharon Anderson, a sexual assault nurse examiner who examined S. S. on the evening of June 16, 2000, testified that she visually observed three fresh tears around S. S.'s vaginal area and that S. S.'s injuries were "consistent with what [Anderson had been] told and [S. S.] having had sexual intercourse in the very recent past." According to Anderson, S. S. told her that "there had been vaginal penetration" and that she thought Weldon had ejaculated on her back. Anderson also testified that S. S. was very tender and irritated in the vaginal area and that a "blue light" she used to detect bodily fluid "was reactive on [S. S.'s] back."

A pubic hair recovered from inside S. S.'s vagina was consistent with Weldon's hair. DNA recovered from the outside of the hair was that of S. S.

Roxie Thompson, an investigator with the Dade County Sheriff's Department, testified that S. S. told her that she and Weldon "started wrestling and . . . that she had sexual relations . . . with [him]." An audiotape of that interview as well as a videotape of a subsequent interview with S. S. were shown to the jury.

At trial, Weldon acknowledged that S. S. came to his apartment on the morning of June 16, 2000, but he denied having sex with her.

1. In his first enumeration of error, Weldon argues that he was deprived of an impartial jury. Specifically, Weldon contends that the trial court erred in qualifying eight jurors who had been peremptorily challenged by Weldon in a previous mistrial of the case. We disagree.

The record reflects that a mistrial was declared in the first trial when Weldon's counsel made an improper statement during his opening argument. Prior to voir dire in the second trial, held the following day, Weldon's counsel objected to the panel of jurors, contending that "eight names on the panel [had been] struck yesterday." Defense counsel argued that the individuals were not impartial and that his client would be forced "to strike them again or [leave] them on [the panel]" in violation of his rights under the Constitution.[1] The trial court overruled counsel's objection finding that, "as long as [the eight individuals are] legally qualified to serve then they can serve again."

Regardless of whether Weldon challenged the array or the poll, his contention is controlled adversely to him by *Hyde v. State.*[2]

---

[1] The record is silent as to which method the trial court used to strike the eight jurors. See, e.g., Uniform Superior Court Rule 11; *Nealy v. State*, 246 Ga. App. 752, 753 (2) (542 SE2d 521) (2000) (trial court did not err in failing to use silent strike method as there is no authority mandating its use).

[2] 196 Ga. 475, 480 (3) (26 SE2d 744) (1943) ("[a] challenge confined to four jurors is not broad enough to vitiate the array, even though otherwise good. *But that jurors, at some previous trial of the prisoner under the same indictment, have been put upon him and one or more of them*

Accordingly, the trial court did not err in denying Weldon's objection.

2. In his second enumeration, Weldon contends that S. S.'s uncorroborated testimony is insufficient to support his conviction for statutory rape. We disagree.

Pursuant to OCGA § 16-6-3 (a), a conviction for statutory rape requires corroboration.[3] However, "[a] child-victim's prior consistent statements, as recounted by third parties to whom such statements were made, can constitute sufficient substantive evidence of corroboration in a statutory rape case."[4] Moreover,

> the quantum of corroboration needed is not that which is in itself sufficient to convict the accused, but only that amount of independent evidence which tends to prove that the incident occurred as alleged. Slight circumstances may be sufficient corroboration and ultimately the question of corroboration is one for the jury.[5]

S. S.'s testimony was corroborated by her mother and police, and by the medical and scientific findings.[6] The evidence was sufficient for a jury to find beyond a reasonable doubt that Weldon committed statutory rape.[7]

3. Lastly, Weldon asserts that the trial court erred by allowing the state, over objection, to ask leading questions on direct examination. In his brief, Weldon lists seven leading questions to which he objected and argues that counsel could not object to more such questions because he would have lost credibility with the jury. Weldon contends that "[a] new trial is the only way to send a message

---

*rejected by him, does not disqualify them,* and is not good even as challenge to the poll.") (punctuation omitted; emphasis supplied), citing *Blackman v. State,* 80 Ga. 785, 788 (2) (7 SE 626) (1888), overruled on other grounds, *Corbin v. State,* 211 Ga. 400, 401 (3) (86 SE2d 221) (1955); *Robinson v. State,* 82 Ga. 535, 539 (4) (a) (9 SE 528) (1889); *Johnson v. State,* 130 Ga. 22-23 (1) (60 SE 158) (1908); *Reid v. State,* 50 Ga. 556, 559-560 (1) (1874); *Esa v. State,* 146 Ga. 17-18 (90 SE 278) (1916). See also *Smith v. State,* 245 Ga. 205, 208 (5) (264 SE2d 15) (1980).

[3] *Eley v. State,* 266 Ga. App. 45, 48 (3) (596 SE2d 660) (2004); *Long v. State,* 189 Ga. App. 131, 132 (1) (375 SE2d 274) (1988).

[4] (Citation and punctuation omitted.) *Lee v. State,* 232 Ga. App. 300, 302 (2) (501 SE2d 844) (1998). See also *Runion v. State,* 180 Ga. App. 440 (1) (349 SE2d 288) (1986).

[5] (Citation and punctuation omitted.) *Collins v. State,* 229 Ga. App. 658, 660 (1) (b) (495 SE2d 59) (1997).

[6] See, e.g., *Reece v. State,* 241 Ga. App. 809, 810 (527 SE2d 642) (2000) (child-victim's testimony about act of intercourse corroborated by her outcry to her mother three weeks after the attack); *Lee,* supra (child-victim's testimony sufficiently corroborated by victim's prior consistent statement to her mother, who testified at trial); *Collins,* supra (child-victim's testimony was sufficiently corroborated by medical testimony and physical evidence on the scene, and by the victim's prior consistent statement to her mother); *Long,* supra (child-victim's testimony sufficiently corroborated by mother and a Department of Family and Children Services worker).

[7] *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

to trial courts that [the] practice [of allowing leading questions] is not immune to appellate scrutiny."

Generally, leading questions are allowed only on cross-examination, however, a trial court has discretion to allow leading questions on direct examination.[8] Here, Weldon has failed to demonstrate that the trial court abused its discretion in permitting the state on specific occasions to ask leading questions.[9] Therefore, this enumeration fails.

*Judgment affirmed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED NOVEMBER 1, 2004 — 

*Charles G. Wright, Jr.,* for appellant.

*Herbert E. Franklin, Jr., District Attorney, Grover W. Hudgins, Assistant District Attorney,* for appellee.

---

[8] OCGA § 24-9-63; *Perkins v. State,* 226 Ga. App. 613, 615-616 (2) (487 SE2d 365) (1997) ("[i]t would be a rare case in which the trial court's exercise of discretion on this issue would warrant reversal") (citation and punctuation omitted).

[9] See, e.g., *Hammond v. State,* 157 Ga. App. 647, 649 (4) (A) (278 SE2d 188) (1981).