865 A.2d 617

**Joseph LAWSON**

v.

**STATE of Maryland.**

**No. 1914, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Jan. 10, 2005.

604

606

Eve L. Brensike (Nancy S. Forester, Public Defender, on brief), for appellant.

Devy Patterson Russell (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel EYLER, JAMES R., KRAUSER, MEREDITH, JJ.

KRAUSER, J.

Appellant, Joseph Lawson, was charged with assaulting and raping his seven-year-old cousin, Nigha P., on at least two separate occasions: [1] while he was staying with Nigha's family

---

1. There may have been a third incident of rape, but the state entered a *nolle prosequi*, before trial, on the charges relating to that incident.

in October or November of 2001 ("November 2001 incident"), and while he was babysitting Nigha's older brother at Nigha's home in June of 2002 ("June 2002 incident"). Neither incident, however, was reported by Nigha until July 2002, when she informed her mother of both.

Appellant was subsequently arrested and charged with, among other crimes, two counts of second-degree rape, two counts of attempted second-degree rape, and two counts of second-degree assault.[2] At his trial before a jury in the Circuit Court for Prince George's County, the state presented three witnesses: Nigha, then eight years old, her mother, and a county social worker, who had interviewed Nigha shortly after this matter came to light. Both Nigha's mother and the social worker testified only as to what Nigha purportedly told them. While Nigha's testimony was largely consistent with the social worker's testimony as to the November 2001 incident, it contradicted her mother's and the social worker's testimony as to the June 2002 incident, in several important respects.

No physical evidence was introduced, although Nigha received a full medical examination following her revelations, nor was any other corroborative evidence presented. The state concluded its case by, among other things, hinting that appellant was a "monster," and implying that the child of appellant's cousin might also be in danger. But no objection was made nor was any mistrial sought on those grounds.

After the jury convicted appellant of all pending charges, the circuit court sentenced him to a term of fourteen years

---

2. Appellant was indicted in the Circuit Court for Prince George's County on charges of child abuse by a household member, "child abuse by other person," three counts of second-degree rape, three counts of attempted second-degree rape, three counts of third-degree sexual offense, and three counts of second degree assault. The state entered a *nolle prosequi* on the "child abuse by other person" charge, on one count each of second-degree rape, attempted second-degree, and second-degree assault, on the three counts of third-degree sexual offense, and the circuit court granted appellant's motion for judgment of acquittal on the remaining child abuse charge.

imprisonment for each of the two rapes; the two sentences were to run concurrently with each other.

Requesting that we now reverse his convictions, appellant claims that the testimony of the social worker should not have been admitted under Maryland Criminal Procedure § 11–304, that the testimony of Nigha's mother should not have been admitted under Maryland Rule 5–802.1, that Nigha's testimony standing alone was not legally sufficient to support any of appellant's convictions, and that the state's closing remarks to the jury were so inflammatory as to warrant a reversal of his convictions by this Court.

## BACKGROUND

Twenty-seven-year-old Joseph Lawson was accused of raping and assaulting Nigha P., sometime between October 1, 2001 and November 30, 2001, and then in June 2002. When these two incidents occurred, Nigha was living at 1205 Kayak Avenue in Prince George's County, with her mother, Tanya Renee Thomas; her brother, Kristopher, who, at the time of trial was eleven years old; her grandparents; and appellant, who is her cousin. Although appellant moved out of that address sometime after the first assault, he continued to "visit or watch" Nigha and her brother.

Nigha did not inform her mother of the abuse until sometime in July 2002. On July 15, 2002, Nigha's mother notified the police that appellant had sexually assaulted her daughter. Two days later, on July 17, 2003, Nigha underwent a physical examination at the Prince George's Hospital Center.[3] And the day after that, on July 18, 2002, Nigha was interviewed by Jennifer Cann, a social worker employed by the Prince George's County Department of Social Services, Child Advocacy Center.

At trial, Nigha testified that, when the first incident occurred, she was sharing a bedroom with her older brother, nine-year-old Kristopher. The children slept in bunk beds:

---

3. The report of this examination was not admitted into evidence.

Kristopher slept on the top bunk and Nigha on the bottom bunk. On the night of the November 2001 incident, Nigha was lying awake in her bed, watching television while her brother slept. Appellant, she testified, entered her bedroom. Exposing his "private part" to her, he asked if she knew what it was. When she said "no," he got into bed with her and, while she was lying down, tried to "stick his private part" into hers, penetrating her "a little bit." After she observed "white stuff" come out of his private part, which she described as a "big long stick," "he went to the bathroom, he got a rag and he told [her] to wipe it up." After she did, he "told [her] not to tell no one." The next incident occurred, approximately eight months later, in June 2002.

Nigha testified that, one day in June 2002, she returned home from school to find appellant alone in the house with her brother, Kristopher. After telling Nigha that he wanted to speak with her about an "incident" that occurred that day, appellant instructed her brother to "look out for" their grandmother, as he and Nigha walked into her mother's bedroom. Once inside the bedroom, appellant, according to Nigha, unsuccessfully attempted to pull down her pants and then told her that she could have some of his soft drink, if she would let him touch her with his private part. She testified that she told him to "stop" and then left the room. She did not, she admitted, see his private part that day. Later, at trial, she recalled talking to a social worker about the incident, but she could not remember telling the social worker that she did see his private part or that "he put a plastic thing on it."

Nigha's mother testified next. Over defense counsel's objection, Nigha's mother stated that, in July 2002, Nigha told her that, when Nigha and appellant were in the living room in June, 2002, he "took his private part," which had a "plastic thing" on it, and "put it in her private part," while the two of them were on a living room couch.

The third and last witness to testify was Jennifer Cann, a social worker employed by the County Department of Social Services. Her job, she testified, entailed "investigat[ing] alle-

gations of child sexual abuse," and "[t]o come to a determination or disposition as to whether or not the abuse occurred." On July 18, 2002, she interviewed Nigha at one of the Prince George's County Department of Social Services buildings. Over defense counsel's objection, Cann testified that, after establishing a rapport with Nigha, she asked a series of non-leading questions to get "information to come from Nigha naturally."

Cann then testified as to what Nigha told her concerning the November 2001 and June 2002 incidents. A detailed account of her testimony will be given when we take up the issue of the admissibility of Nigha's statement to her later in this opinion. Suffice it to say that her testimony was consistent with Nigha's as to the November 2001 incident and was consistent with the testimony of Nigha's mother as to the June 2002 incident. The testimony of both women, however, was inconsistent with Nigha's as to what occurred in June of 2002, as Nigha testified that she did not have sexual intercourse with appellant at that time.

The state then rested, and appellant took the stand. He denied that he ever raped Nigha or touched Nigha in an inappropriate manner.

When the trial ended, the jury found appellant guilty of both incidents, the November 2001 and the June 2002 incident, convicting him of two counts of second-degree rape, two counts of attempted second-degree rape, and two counts of second-degree assault.

## I.

Appellant contends that the circuit court "erred when it permitted a county-employed social worker[,] who was a stranger to the complaining witness[,] and who interviewed the complaining witness during a police investigation[,] to testify under Criminal Procedure § 11–304 as to the complaining witness's description of the alleged sexual assaults." The social worker, Jennifer Cann, testified as to what Nigha told her concerning the incidents of November 2001 and June

2002[4] Cann stated that Nigha told her that, one night in October or November of 2001, she was lying in bed watching television, when appellant exposed himself to her and asked her if she "knew what it was," apparently referring to his penis. When Nigha said she did not know what it was, "appellant started putting his private part in [her] private part." Nigha told Cann that she saw "white stuff come out of the front of his private part[,]" whereupon appellant "went in the bathroom and got a rag." After "wip[ing] off the side of the bed", appellant, Nigha informed Cann, "wiped her private part off" and said to her, "Don't tell nobody."

Cann further testified that Nigha confided to her that, one afternoon in June of 2002, she arrived home from school to find appellant and her brother in the living room eating Popeye's chicken. Appellant "told her he needed to discuss something with her in the bedroom, her mother's bedroom, and she went in there with him." When appellant "told her that he wouldn't give her any chicken unless she let him touch her," Nigha "said 'no' and left the room." Later, according to Cann, when both Nigha and appellant were in the living room, appellant "then told her brother to go across the street and get some chips." After he left, appellant "placed her in a chair," knelt in front of her, and "put a plastic thing on his private part right before he put his private part in her private part." Cann testified that Nigha "described him pushing it in there, referring to his private parts, and that he ... had his private part in her private part until her brother came back to the house and knocked on the door."

That testimony, appellant claims, ran afoul of Md.Code (1957, 2001 Repl.Vol.), § 11–304(c) of the Criminal Procedure Article ("C.P."), which provides:

---

4. Even though appellant was on trial for two counts of rape, Cann testified to a third incident that allegedly occurred the day after the first incident. As to this incident, Cann testified that Nigha told her that appellant penetrated her on the bedroom floor, but she did not "see if anything came out of his private part." As noted earlier, see *supra* note 3, the state entered a *nolle prosequi* to the charges relating to this incident.

*Recipients and offerors of statement*—An out of court statement may be admissible under this section only if the statement was made to and is offered by a person acting lawfully in the course of the person's profession when the statement was made who is:

(1) a physician;

(2) a psychologist;

(3) a nurse;

(4) a social worker; or

(5) a principal, vice principal, teacher, or school counselor at a public or private preschool, elementary school, or secondary school.

■ While conceding Cann was a qualified social worker under Maryland law at the time she interviewed Nigha,[5] appellant contends that, at the time of that interview, Cann was not "acting lawfully in the course of ... [her] profession" under C.P. § 11–304(c). Rather, appellant maintains, Cann was, at that time, acting as an "agent of the state who was brought into this case for the purpose of evidence collection rather than for the purpose of treatment," and therefore, her testimony was not admissible under that statutory exception to the hearsay rule.

Appellant's claim requires that we first determine whether, when Cann was interviewing Nigha, she was "acting lawfully in the course of [her] profession," a locution that has not heretofore been the subject of appellate scrutiny. We begin by noting that Cann, in interviewing Nigha, was performing duties mandated by state law. Section 5, subtitle 7 of Maryland's Family Law Article, entitled "Child Abuse and Neglect," requires the Department of Social Services, among others, to promptly investigate "a report of suspected physical or sexual abuse." Specifically, it states, in part:

---

5. Cann testified that she has a master's degree in social work specializing in clinical work with children and families. She also testified that she is a "licensed" social worker. *See* Md.Code (1981, 2000 Repl.Vol.), § 19–101(g) of the Health Occupations Article.

(b) *Time for initiation; actions to be taken.*—Within 24 hours after receiving a report of suspected physical or sexual abuse[,] . . . the local department [of Social Services] or the appropriate law enforcement agency shall:

(1) see the child;

(2) attempt to have an on-site interview with the child's care taker;

(3) decide on the safety of the child, wherever the child is, and of other children in the household; and

(4) decide on the safety of other children in the care or custody of the alleged abuser.

(c) *Scope.*—The investigation shall include:

(1) a determination of the nature, extent, and cause of the abuse or neglect, if any;

Md.Code (1984, 1999 Repl.Vol.), § 5–706 of the Family Law Article ("F.L.").

Consistent with that statute, Cann's duties, as a social worker at the Prince George's County Department of Social Services, required her to "investigate allegations of child sexual abuse" and "come to a determination or disposition as to whether or not the abuse occurred." She interviewed Nigha for that purpose, explaining "[t]he agency had received allegations that Nigha had been sexually abused." In short, she performed her duties, as required by Maryland law, specifically F.L. § 5–706(b).

Moreover, the General Assembly enacted C.P. § 11–304(c) permitting social workers to testify as to out of court statements made to them while they were "acting lawfully in the course of [their] profession," after enacting F.L. § 5–706, imposing upon the local departments of social services the professional duty to investigate reports of sexual abuse and to interview the victims of such abuse. Presuming, as we must, that the General Assembly knew that it had defined the professional duties of departmental social workers to include interviewing the victims of sexual abuse, when it enacted legislation permitting the same social workers to testify as to

statements made to them in the course of their professional duties by victims of such abuse, *see Cicoria v. State,* 332 Md. 21, 43, 629 A.2d 742 (1993), we conclude that performing such interviews falls within scope of the lawful professional actions of a departmental social worker. We therefore hold that, when Cann interviewed Nigha about being sexually abused by appellant, she was "acting lawfully in the course of [her] profession."

Although Cann's interview of Nigha, as appellant correctly points out, aided the state in the collection of evidence against appellant and thereafter in his prosecution, it was, to be sure, principally intended to protect Nigha from further sexual abuse.[6] That it may have ultimately served more than one purpose does not render it inadmissible as long as it otherwise qualifies as a hearsay exception, which it does. *See Webster v. State,* 151 Md.App. 527, 827 A.2d 910 (2003).

Appellant counters, however, that Nigha's statements to Cann were untrustworthy, as she was nothing more than a stranger to Nigha at the time of the interview. "Only statements obtained by someone in a trusting relationship with the child would satisfy hearsay concerns regarding reliability and trustworthiness," he maintains. Appellant then draws the following analogy: The "distinction between familiar social workers with whom the child has a relationship and unfamiliar social workers who are employed by the state to investigate allegations of criminal activity can be analogized," he reasons, "to the distinction between treating and examining physicians in the context of the hearsay exception for statements made to a treating physician." "Just as an examining physician who is hired for purposes of litigation does not instill the requisite trust in a patient to ensure that the patient gives truthful information, the social worker who is a stranger, sent by the state after an allegation of sexual abuse is made, similarly

6. As F.L. § 5–702 states, "[t]he purpose of this subtitle is to protect children who have been the subject of abuse or neglect by[,]" among other things, "requiring prompt investigation of each reported suspected incident of abuse or neglect. . . ."

does not instill the requisite trust in the child to ensure that the child gives a complete and truthful account of the alleged abuse," he concludes.

But the prior relationship between the child victim and the social worker, though relevant, is not the only factor the court must consider in determining the admissibility of the child's statement to the social worker. Indeed, C.P. § 11–304(e) [7] provides that, to determine whether "[a] child victim's out of court statement is admissible . . . the court shall consider, but is not limited to," thirteen factors. At an *in camera* pre-trial hearing, the court did just that. When the hearing concluded, the court found: 1) that Nigha possessed detailed personal knowledge of the events; 2) that she testified "very forthright-ly" and did not appear to be "holding anything back"; 3) that

---

7. Section 11–304(e) states:

(e)(1) A child victim's out of court statement is admissible under this section only if the statement has particularized guarantees of trust-worthiness.

(2) To determine whether the statement has particularized guaran-tees of trustworthiness under this section, the court shall consider, but is not limited to, the following factors:

(i) the child victim's personal knowledge of the event;

(ii) the certainty that the statement was made;

(iii) any apparent motive to fabricate or exhibit partiality by the child victim, including interest, bias, corruption, or coercion;

(iv) whether the statement was spontaneous or directly responsive to questions;

(v) the timing of the statement;

(vi) whether the child victim's young age makes it unlikely that the child victim fabricated the statement that represents a graphic, de-tailed account beyond the child victim's expected knowledge and experience;

(vii) the appropriateness of the terminology of the statement to the child victim's age;

(viii) the nature and duration of the abuse or neglect;

(ix) the inner consistency and coherence of the statement;

(x) whether the child victim was suffering pain or distress when making the statement;

(xi) whether extrinsic evidence exists to show the defendant or child respondent had an opportunity to commit the act complained of in the child victim's statement;

(xii) whether the statement was suggested by the use of leading questions; and

(xiii) the credibility of the person testifying about the statement.

the court was certain that the statements were made; 4) that Nigha did not possess a motive to fabricate her testimony; 5) that the social worker did not impermissibly lead or coerce Nigha's testimony; 6) that Nigha described the incidents using language that is appropriate for her age; 7) that the timing of the statement did not impair its reliability; 8) that her detailed knowledge of the events enhanced her credibility; 9) that Nigha was not suffering from "any major distress when making the statement"; and 10) that the social worker appeared to be a credible witness and "capable historian." Given that appellant does not contest any of these findings, we hold that the circuit court did not err in admitting Cann's statements, regardless of the fact that Cann and Nigha had never met before the interview took place.

## II.

Appellant contends that the circuit court erred in permitting Nigha's mother to testify at trial as to what Nigha said to her concerning the June 2002 incident under the "prompt complaint of sexually assaultive behavior" hearsay exception of Rule 5–802.1(d). Appellant claims that Nigha's statements to her mother "do not qualify for admission as prompt complaints of sexually assaultive behavior, because the statements were not consistent with [Nigha's] trial testimony. . . ." And, "even if the statements did fall within the scope of the hearsay exception, they were not," appellant insists, " 'prompt' within the contemplation of the rule[,] and therefore[,] should not have been admitted."

Rule 5–802.1(d) provides:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

. . . .

(d) A statement that is one of prompt complaint of sexually assaultive behavior to which the declarant was subjected

if the statement is consistent with the declarant's testimony.

■ Rule 5–802.1(d) was adopted by the Court of Appeals in 1994. Given our recent discussion of the origins of this rule and the policy underlying it in *Gaerian v. State*, 159 Md.App. 527, 860 A.2d 396, 2004 WL 2403157 (2004), we need not concern ourselves with that here, except to reiterate that Rule 5–802.1(d) embodies a principle that "has been the settled law of Maryland for over one hundred years that 'a victim's timely complaint of a sexual attack is admissible as part of the State's case-in-chief.'" *Nelson v. State*, 137 Md.App. 402, 409, 768 A.2d 738 (2001) (quoting *Cole v. State*, 83 Md.App. 279, 287, 574 A.2d 326 (1990)). "It is not merely rebuttal evidence," we have observed, "because 1) it may be offered in the State's case-in-chief, 2) it is not hedged in by limiting instructions, and 3) its admissibility is not contingent upon the defendant's doing something first." *Cole*, 83 Md.App. at 289, 574 A.2d 326. "On the other hand," we have cautioned, "it is not fully autonomous substantive evidence, because it is subject to limitations such as 1) the requirement that the victim actually testify; 2) the timeliness of the complaint; and 3) the extent to which the references may be restricted to the fact that the complaint was made, the circumstances under which it was made, and the identification of the culprit, rather than recounting the substance of the complaint in full detail." *Id.*

Appellant contends that, because the testimony of Nigha's mother was, in his words, "wholly inconsistent" with Nigha's, the circuit court erred in admitting it under Rule 5–802.1. He cites as authority for that position *Corbett v. State*, 130 Md. App. 408, 746 A.2d 954 (2000). In that case, the defendant was charged with attempting to rape his girlfriend's twelve-year-old daughter. *Id.* at 411, 746 A.2d 954. When the adolescent complainant could not remember what had happened, except for some "events peripheral to the allegations against" the defendant, she was permitted to read to the jury a portion of a handwritten statement she gave police shortly after the incident inculpating the defendant. *Id.* at 412, 746 A.2d 954. The entire statement was later admitted into

evidence over defense counsel's objection. *Id.* at 414–15, 746 A.2d 954.

Declaring the admission of that statement to be error, this Court noted that "to qualify under this rule, the [out-of-court] statement must be consistent with the witness's testimony at trial." *Id.* at 428, 746 A.2d 954. "Although [the complainant's] trial testimony about some peripheral facts was consistent with her recitation of those facts in her written statement, none of those facts," we pointed out, "concerned sexually assaultive behavior on appellant's part," and therefore we concluded that "Rule 5–802.1(d) was not applicable." *Id.*

Nigha's testimony concerning the June 2002 incident not only fell far short of making out a case of second-degree rape, but in fact exculpated appellant of that charge. *See* Md.Code (1957, 2002 Repl.Vol.), § 3–304 of the Criminal Law Article (stating that second degree rape requires "vaginal intercourse"). At trial, Nigha stated that when she returned home from school appellant was there babysitting her older brother. When she and appellant went into her mother's bedroom to talk, he tried unsuccessfully to pull down her pants. She told him to stop and left the room. Nothing happened after that, she testified, and she did not see his "private part" that day.

That testimony conflicted with her mother's version of what occurred on that occasion. Nigha's mother claimed that Nigha had told her that she and appellant were on the living room couch when appellant "took his private part," which had "a plastic thing" on it, and "put it in her private part." Because the testimony of Nigha and of her mother was not only completely at odds, but differed as to whether in fact the crime of rape had ever occurred on that date, we hold that the trial court erred in admitting the testimony of Nigha's mother under Rule 5–802.1(d).

But that error, the state contends, was harmless error. There was, the state assures us, "other highly persuasive evidence" of appellant's guilt. "The jury's verdict," the state avows, "would ... have been the same, with or without Thomas's testimony."

■ For an error to be harmless, "[u]pon an independent review of the record, we must be able to declare, beyond a reasonable doubt, that the error in no way influenced the verdict...." *Collins v. State,* 373 Md. 130, 148, 816 A.2d 919 (2003). That we cannot do here.

Contrary to the state's claim, there was no "other highly persuasive evidence of Lawson's guilt." No medical evidence or other corroborative evidence was presented that appellant raped Nigha in June 2002, except, that is, for the testimony of the social worker, whose sole source of information was the same as Nigha's mother: Nigha's post-incident statement which was repudiated by Nigha at trial. When the state's case relies exclusively, as it does here as to the June 2002 incident, on the credibility of a single witness, the bolstering of that witness's credibility with testimony of another witness, which should not have been admitted into evidence, cannot be harmless. *See McCray v. State,* 122 Md.App. 598, 610–11, 716 A.2d 302 (1998). We shall therefore reverse all of appellant's convictions that relate to the June 2002 incident. In doing so, we note that appellant's convictions for the earlier incident of November 2001 rested on far firmer evidentiary grounds, and therefore, we are persuaded beyond a reasonable doubt that the admission of the testimony of Nigha's mother as to the June 2002 incident did not unfairly prejudice appellant as to the November 2001 incident.

### III.

■ Appellant contends that "the statements of the alleged child victim, standing alone without any independent corroboration, were legally insufficient to convict [him] of two counts of second-degree rape and two counts of attempted second-degree rape[,]" particularly when, as to one of the alleged rapes, the child denied that a rape had ever occurred.

The requirement of corroboration in sex crime cases does not have roots that extend much beyond the twentieth century. Conceived shortly before that century began, it attracted

little legislative or judicial support, and then, before that century ended, almost completely disappeared.

It was, to be sure, never a part of our common law tradition. "At common law," as Wigmore notes, "the testimony of the prosecutrix or injured person, in the trial of all offenses against the chastity of women, was alone sufficient evidence to support a conviction; neither a second witness nor corroborating circumstances were necessary." 7 Wigmore on Evidence § 2061 (3d ed.1940). That changed, in small measure, when, in 1886, "the New York legislature became the first to enact a corroboration requirement for the prosecution of rape, a provision purportedly designed to protect the defendant from an 'untruthful, dishonest, or vicious complaint.' " Michelle J. Anderson, *The Legacy of the Prompt Complaint Requirement, Corroboration Requirement, and Cautionary Instructions on Campus Sexual Assault,* 84 B.U.L.Rev. 945, 956–57 (2004) (footnotes omitted). By the early 1970s, seven jurisdictions, Georgia, Idaho, Iowa, New York, the Virgin Islands, the District of Columbia, and Nebraska, had legislatively or judicially adopted a corroboration requirement. *Id.* at 957.

The three principal justifications for the corroboration requirement were summarized by the Supreme Court of Idaho, in the very case in which it finally discarded that requirement. According to that court, they were: "(1) the ease of fabrication and the fear of frequent false charges due to the emotion connected with the act of intercourse; (2) the chance of conviction solely because of the emotional reaction of the jury to the alleged facts of the charge; and (3) the difficulty of disproving an accusation of rape." *Idaho v. Byers,* 102 Idaho 159, 627 P.2d 788, 790 (1981) (citing *United States v. Sheppard,* 569 F.2d 114, 116 (D.C.Cir.1977)). But "these justifications," the Idaho court noted, "have come under increasingly heavy attack. . . ." *Byers,* 627 P.2d at 790. Explaining the reasons for this shift in policy, the court stated: "As to the first justification, there is no evidence showing that sex crime charges are frequently falsified or that sexual victims are an inherently unreliable class whose testimony should not be believed in the absence of corroboration." *Id.* And, as to "the

latter two justifications," the court observed, they "seem insubstantial in light of available evidence which indicates that it is more difficult to convict for rape than for other major crimes...." *Id.* (citing *People v. Rincon–Pineda,* 14 Cal.3d 864, 123 Cal.Rptr. 119, 538 P.2d 247, 257–59 (1975); The Rape Corroboration Requirement: Repeal Not Reform, 81 Yale L.J. 1365, 1382–84 (1972)).

In rejecting a requirement that it formerly embraced, the Idaho court quoted at length from an opinion of the Supreme Court of Rhode Island in *State v. Cabral,* 122 R.I. 623, 410 A.2d 438, 441 (1980), in which Rhode Island's highest court explained its reasons for holding that the crime of rape should be treated no differently from any other crime, whether it involved an adult or a child. That court observed:

> The requirement for independent corroboration in sex-offense cases has been the subject of ever increasing criticism. Contemporary empirical studies suggest that the factors employed to support the corroboration requirement do not justify the rule. There is a great reluctance to report a rape. Amir, Patterns in Forcible Rape 27–28 (1971); Note, Rape and Rape Laws: Sexism in Society and Law, 61 Cal. L.Rev. 919, 921 (1973). Juries generally tend to view rape charges with skepticism and suspicion, especially when there is a suggestion of willingness or agreement on the part of the victim, Kalven and Zeisel, The American Jury 249–254 (1966), *see also* Commonwealth v. Bailey, 370 Mass. 388, 394, 348 N.E.2d 746, 750 (1976), and convictions, in the absence of aggravating circumstances, are the exception rather than the rule. Holstrom, The Victim of Rape Institutional Reactions 238 (1973) (the study of 109 rape cases: eighteen cases were tried; four concluded with a guilty verdict, ten not guilty, one with a hung jury, and three with a guilty verdict on a lesser charge).

> The corroboration requirement poses a major hurdle to a legitimate conviction for a sex offense. Due to the nature of sex crimes, eyewitnesses are seldom available. *Stapleman v. State,* 150 Neb. 460, 464, 34 N.W.2d 907, 910 (1948)....

> Most women, when confronted with a weapon-wielding as-

sailant, make the sensible decision not to resist physically. Thus, they lack the bruises and torn clothing that would otherwise corroborate the crime.

*Cabral,* 410 A.2d at 441 (footnote omitted).

But of particular relevance to appellant's demand that we impose a corroboration requirement in sex crime cases involving a juvenile victim, is the observation by the Rhode Island court that "[j]uvenile complainants are more likely to be attacked by someone with whom they are acquainted and, therefore, are less likely to encounter a weapon and threat of battery and are less likely to scream and resist." *Cabral,* 410 A.2d at 441. We feel impelled to add that such victims are also less likely than their adult counterparts to appreciate the criminality of the sex acts, to understand the protections that society affords the victims of such crimes, and to have the opportunity to report the offense.

■ Today, every jurisdiction has eliminated its general corroboration requirement for sex offense cases, and all but two have rejected a corroboration requirement in statutory rape cases. *See* Ga.Code Ann. § 16–6–3 (2003); Miss.Code Ann. § 97–3–69 (2000). Maryland is no exception to this trend. In fact, "[i]t is well settled" in Maryland "that the testimony of a victim of a rape, standing alone, will constitute legally sufficient evidence to support a conviction," whether the victim is an adult, *Estep v. State,* 14 Md.App. 53, 286 A.2d 187 (1972), or a child. *Moore v. State,* 23 Md.App. 540, 329 A.2d 48 (1974). And no argument has been advanced today that persuades us that we should depart from this long standing principle.

We do note, however, that, despite the absence of a corroboration requirement in Maryland law, Nigha's testimony was, in fact, fully corroborated by the social worker's testimony as to the November 2001 incident. And Nigha's testimony, in turn, partially corroborated her social worker's testimony as to what occurred in June 2002. While a prior consistent statement of a witness, as recounted by a third party, has not been deemed corroborative evidence of the witness's trial testimony in all

situations, *see, e.g., Turner v. State,* 294 Md. 640, 452 A.2d 416
(1982) (holding that a "third party relating an excited utter-
ance made by an accomplice to the third party" does not
"provide[ ] the necessary corroboration of the accomplice's
testimony[,]" as required by Maryland law), it has been held to
"constitute sufficient substantive evidence of corroboration" in
one of the two states that still statutorily require corrobora-
tion in statutory rape cases. *Weldon v. State,* 270 Ga.App.
262, 606 S.E.2d 329 (2004). In so holding, the Court of
Appeals of Georgia stressed, "the quantum of corroboration
needed is not that which is in itself sufficient to convict the
accused, but only that amount of independent evidence which
tends to prove that the incident occurred as alleged." *Id.* at
331. "Slight circumstances," the Georgia court added, "may be
sufficient corroboration . . . ." *Id.*

As for both incidents of alleged rape in the instant
case, the corroborative evidence presented exceeded "slight
circumstances." Moreover, under Maryland law, Nigha's tes-
timony, standing alone, as to the November 2001 incident, and
the social worker's testimony, standing alone, as to the June
2002 incident, when viewed "in the light most favorable to the
prosecution," *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct.
2781, 61 L.Ed.2d 560 (1979); *accord State v. Smith,* 374 Md.
527, 533, 823 A.2d 664 (2003); *Moye v. State,* 369 Md. 2, 12,
796 A.2d 821 (2002), provided evidence upon which a rational
fact finder could have found appellant guilty beyond a reason-
able doubt of both crimes. That Nigha's testimony contradict-
ed her mother's and the social worker's as to whether a rape
occurred in June 2002 does not affect the admissibility of the
social worker's testimony under C.P. § 11–304. That section
does not require that the victim's out-of-court statement to a
third party be consistent with the victim's in-court testimony
to be admissible and, with good reason. "[A] young child can
be easily intimidated into not testifying about [such] of-
fenses . . . ." *State v. Benwire,* 98 S.W.3d 618, 624 (Mo.Ct.App.
2003). For that reason and others, "as a general phenomenon,
child abuse victims frequently recant their initial reports of
abuse." *Yount v. State,* 99 Md.App. 207, 210, 636 A.2d 50

(1994). Indeed, it has been observed that a child's out-of-court statements may "be more reliable than the child's testimony at trial, which may suffer distortion by the trauma of the courtroom setting or become contaminated by contacts and influences prior to trial." *Benwire*, 98 S.W.3d at 624 (citation and emphasis omitted).

That is why, we hold, that any conflicts between Nigha's out-of-court statements and her in-court testimony do not render her out-of-court statements inadmissible, but rather present a question of credibility to be resolved by the jury. As Judge Learned Hand observed in *Di Carlo v. United States*, 6 F.2d 364, 368 (2d Cir.1925), "[i]f, from all that the jury see of the witness, they conclude that what [she] says now is not the truth, but what [she] said before, they are none the less deciding from what they see and hear of that person and in court."

## IV.

Appellant contends that the circuit court erred "in permitting the State to make impermissible and inflammatory arguments to the jury" during its closing and rebuttal arguments. During closing argument, the State, according to appellant, violated the "prohibition of 'golden rule' arguments" and "unconstitutionally shifted the burden of proof to appellant," and then, on rebuttal, the State, he claims, "appealed to the jurors' prejudices and fears" by characterizing him as a "monster" and "child molester" and impermissibly "suggested that appellant would commit similar crimes on another specific victim if acquitted."

### Closing Argument

Although we have declared that "[c]losing argument 'is a robust forensic forum wherein its practitioners are afforded a wide range of expression,' " *McCracken v. State*, 150 Md.App. 330, 361, 820 A.2d 593 (2003) (quoting *Williams v. State*, 137 Md.App. 444, 455, 768 A.2d 761 (2001)), we have also cautioned that this range "has bounds." *Wilson v. State*, 148 Md.App. 601, 654, 814 A.2d 1 (2002). In other

words,"[d]espite the wide latitude afforded attorneys in closing arguments, there are limits in place to protect a defendant's right to a fair trial." *Degren v. State,* 352 Md. 400, 430, 722 A.2d 887 (1999); see *Wilhelm v. State,* 272 Md. 404, 413–15, 326 A.2d 707 (1974). Reversal, however, is only warranted when " 'it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused.' " *Degren,* 352 Md. at 431, 722 A.2d 887 (quoting *Jones v. State,* 310 Md. 569, 580, 530 A.2d 743 (1987)).

 When reviewing a closing argument on appeal, we will first determine whether counsel made an improper argument. If not, our inquiry ends. But if we find that the argument was improper, we must then determine whether the argument was sufficiently prejudicial to warrant a reversal of conviction. *See Walker v. State,* 121 Md.App. 364, 382, 709 A.2d 177 (1998). We now turn to the remarks at issue.

During closing argument, the state instructed the jurors:

I want you to put yourself in the shoes if you have an eight-year-old niece, seven-year-old niece, or you have an eight-year-old daughter, seven-year-old daughter, a cousin, a close family friend, and this child comes to you and says that someone that you know sexually molested them. What would go through your minds?

It then pointed out that the defense had failed to present any evidence as to why Nigha would lie about what had happened:

Well, I would urge you to think about certain things. One, motive. What is the motive here? Have you heard any motive? Did the defense give you a motive as to why Nigha would be lying?

When the defense objected to these comments, the court overruled that objection, whereupon the state returned to requesting that the jurors place themselves in the shoes of Nigha's mother:

I urge you, while putting yourself in the shoes of someone who has had a child come to them and tell them this, what else do you look at? Well, again, you would look at the details.

"[A]n advocate may not implore jurors," appellant asserts, "to consider their own interests by asking them to put themselves in the shoes of a party or a witness to the case." *See, e.g., Holmes v. State,* 119 Md.App. 518, 705 A.2d 118 (1998). This is known as the "golden rule" argument, and, as appellant states, such "arguments are impermissible because they encourage the jurors to abdicate their position of neutrality and decide cases on the basis of personal interest rather than the evidence."

In *Holmes,* the only case upon which appellant relies in advancing this argument, the state urged the jury to convict Holmes of possession with intent to distribute both heroin and cocaine, declaiming: "This is not about jail time. It's about the day of reckoning, the day of accountability, the day we say no, Mr. Holmes, no longer will we allow you to spread that poison on the streets." *Id.* at 526–27, 705 A.2d 118. Although we reversed Holmes's convictions on other grounds, we found those statements to be improper, explaining: "The 'we say no' comments implore jurors to consider their own interests and therefore violate the prohibition against the 'golden rule' argument." *Id.* at 527, 705 A.2d 118.

"By asking the jurors to put themselves in the shoes of Nigha's mother and give Nigha the same credibility that they would give their own daughter, the State," appellant asserts, "improperly appealed to the passions of the jury in order to persuade them to believe Nigha's version of events." "After all," appellant asks rhetorically, "who wouldn't believe their own daughter?"

Although a violation of the golden rule prohibition, the argument was not, standing alone, so prejudicial as to deny appellant a fair trial. It did not request, as the state's comments did in *Holmes,* that the jurors consider their own interests in reaching a verdict. Nor did it amount to more

than a brief remark, which was abandoned almost as quickly as it was made. Moreover, the court instructed the jury, before closing argument, that it was to "consider this case fairly and impartially ... without bias or prejudice," and not to let "sympathy, prejudice or public opinion" sway them, thereby mitigating whatever prejudice might have been engendered by this remark.

Appellant also claims that the state, in its closing, "diluted its own obligations and shifted the burden of proof to Appellant." The state did so, appellant maintains, "[b]y arguing that the defense ha[d] a responsibility to provide the jury with a reason why Nigha would lie," which in effect "imposed on Appellant a duty to present evidence in violation of Appellant's constitutional due process rights...."

It is well settled that a prosecutor may not "comment upon the defendant's failure to produce evidence to refute the State's evidence." *Eley v. State*, 288 Md. 548, 555 n. 2, 419 A.2d 384 (1980); *Garrison v. State*, 88 Md.App. 475, 480, 594 A.2d 1264 (1991) (citing *Eley*, 288 Md. at 555 n. 2, 419 A.2d 384); *Woodland v. State*, 62 Md.App. 503, 490 A.2d 286 (1985) (citing *Eley*, 288 Md. at 555 n. 2, 419 A.2d 384). After urging the jury "to think about certain things," especially "motive," the state asked a series of rhetorical questions, which ultimately placed the burden of explaining the complainant's motive squarely on appellant. The state asked, "What is the motive here? Have you heard any motive? Did the defense give you a motive as to why Nigha would be lying?" Although in question form, the state's comments were clearly asserting that appellant had failed to present evidence to rebut the state's claim.

But those remarks, even if improper, did not so prejudice appellant as to deny him a fair trial. The court's instructions to the jury, which preceded that misleading statement, corrected the state's misassignment of the burden of proof. In those pre-deliberation instructions, the court reminded the jury that "[t]he State has the burden of proving beyond a reasonable doubt" the defendant's guilt; that "[t]his burden

remains on the State throughout the trial"; and that "[t]he Defendant is not required to prove his innocence."

## Rebuttal

■■ Appellant complains that, on rebuttal, the state described him as a "monster" and a "child molester" and suggested that he was a threat to the safety of the eleven-year-old child of his cousin. What the state actually said was:

What does a monster look like? Looks like different things to different people. What does a sexual molester look like? He looks like someone you know. He looks like your uncle, your brother, your sister, your cousin. It's possible. But there is no certain way that someone who molests children looks. But they do ingratiate themselves. They make themselves indispensable. They are friendly, always there to watch.

Not everyone is like that, but please don't misunderstand me because the important point here is that a child molester looks like anybody else. That's why they are able to do what they do, because they look like all of us, and we trust.

When I said that they ingratiate themselves, they make themselves indispensable. They make themselves helpful. The defendant told you, himself, he is paying for an apartment and he is not living there. He is letting an adult female cousin, who just happens to have a little 11–year–old child, live there.

■■■ But, after these remarks were made, appellant did not object to them, ask that they be stricken, request a mistrial or demand some other form of remedial action. Generally, a timely objection must be made to preserve an issue for appeal, otherwise it is waived. *See* Md. Rule 4–323(a). The only exception to that rule is when the closing argument constitutes plain error. *McCracken v. State,* 150 Md.App. 330, 362, 820 A.2d 593 (2003); see also *Bruce v. State,* 328 Md. 594, 611, 616 A.2d 392 (1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993). Plain error is invoked, however, only in instances which are "compelling, extraordinary, excep-

tional or fundamental to assure the defendant of a fair trial." *Stanley v. State,* 157 Md.App. 363, 370, 851 A.2d 612 (2004); *see also State v. Daughton,* 321 Md. 206, 210–11, 582 A.2d 521 (1990) ("an appellate court may recognize *sua sponte* plain error, that is, error which vitally affects a defendant's right to a fair and impartial trial.").

■ There are three limitations "on the affirmative act of noticing plain error": 1) there must be error; 2) it must be plain; and 3) it must be material. *Morris v. State,* 153 Md.App. 480, 507 n. 1, 837 A.2d 248 (2003) (citations omitted). Accordingly, to determine whether allowing a closing argument constitutes plain error, we must first examine whether allowing the closing argument constituted error, that is to say, that the argument was improper and that it prejudiced the jury.

As noted above, appellant contends that there were two instances of error in the prosecutor's rebuttal argument. First, he claims that the "description of him as a 'monster' and 'child molester' was wholly inappropriate and was specifically designed to inflame the jurors' prejudice against a class of hated individuals within society."

In support of this argument, appellant cites cases in which the prosecutor characterized the defendant as "a child molester," "a pervert," and "animal," but in none of these cases was the issue of whether the comment was reversible error reached. *See Walker,* 121 Md.App. at 374, 709 A.2d 177 (during closing arguments, the prosecutor stated "The evidence reveals that you—that he's an animal."); *State v. Matthews,* 358 N.C. 102, 591 S.E.2d 535, 542 (2004) ("During closing argument the prosecutor characterized defendant as a 'monster,' 'demon,' 'devil,' 'a man without morals' and as having a 'monster mind.' ").

Nonetheless, the instant case is distinguishable from the cases relied on by appellant. The state never directly characterized appellant as a "monster" or "sexual molester." In each instance, it was an isolated comment with no direct reference to appellant. Indeed, viewing the state's comments

in the context of its entire argument, we do not find that the challenged comments vitally affected appellant's right to a fair and impartial trial.

■ "Even more egregious," appellant insists, "was the prosecutor's rather explicit suggestion to the jury that appellant would sexually assault his cousin's eleven-year-old child if he was not convicted of this crime." Although no Maryland appellate court has addressed this precise issue, other state courts have.

"It is undoubtedly improper," declared the Court of Appeals of Idaho, "for a prosecutor to raise the specter of possible future criminality of the defendant as a reason for the jury to return a guilty verdict." *State v. Brown*, 131 Idaho 61, 951 P.2d 1288, 1297 (1998); *see also State v. Williams*, 145 S.W.3d 874, 2004 WL 2289600 (Mo.Ct.App. Oct.12, 2004); *Williams v. State*, 261 Ga.App. 511, 583 S.E.2d 172, 177 (2003); *People v. McNeal*, 175 Ill.2d 335, 222 Ill.Dec. 307, 677 N.E.2d 841, 855 (1997). "Such a prediction of future offenses," the Idaho court explained, "is not a 'fact' proven by the evidence and hence not an appropriate subject for the jury's decision or counsel's argument." *Brown*, 951 P.2d at 1297. We agree. The statement at issue was entirely improper.

Even so, "[t]he fact that an error may have been *prejudicial* to the accused does not, of course, *ipso facto* guarantee that it will be noticed." *Morris*, 153 Md.App. at 512, 837 A.2d 248. This is because "[i]f every material (prejudicial) error were *ipso facto* entitled to notice under the 'plain error doctrine,' the preservation requirement would be utterly meaningless." *Id.* at 511, 837 A.2d 248.

Indeed, courts are reluctant to find plain error in closing arguments. *See Clermont v. State*, 348 Md. 419, 704 A.2d 880 (1998); *Rubin v. State*, 325 Md. 552, 602 A.2d 677 (1992); *Perry v. State*, 150 Md.App. 403, 822 A.2d 434 (2002); *Beard v. State*, 42 Md.App. 276, 399 A.2d 1383 (1979). This principle holds true even when the prosecutor impermissibly argues that the jury should convict a defendant in order to prevent him from committing future crime. *See State v. Williams*, 145

S.W.3d 874 (2004); *State v. Dixon,* 70 S.W.3d 540 (Mo.App. 2002); *State v. Brown,* 131 Idaho 61, 951 P.2d 1288 (1998). This case presents no persuasive reasons why it should be an exception to this well established rule. The remarks at issue were unquestionably improper but, in each instance, they were short, isolated, and vague comments and thus did not vitally affect appellant's right to a fair and impartial trial.

**JUDGMENT AS TO SECOND COUNT OF SECOND–DEGREE RAPE AND ATTEMPTED SECOND–DEGREE RAPE REVERSED. REMAINING JUDGMENTS AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS TO BE SPLIT EQUALLY BETWEEN APPELLANT AND PRINCE GEORGE'S COUNTY.**