886 A.2d 876

Joseph LAWSON

v.

STATE of Maryland.

No. 12, Sept. Term, 2005.

Court of Appeals of Maryland.

Nov. 28, 2005.

Eve L. Brensike, Assigned Pro Bono Counsel, University of Michigan Law School, Ann Arbor, Nancy S. Forster, Public Defender, Michael R. Braudes, Asst. Public Defender, all on brief, for petitioner.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Russell P. Butler, Tracy Delaney, Upper Marlboro, Thomas P. Steindler, Mark H. Churchill, Eric S. Johnson, McDermott, Will & Emery, LLP, Washington, DC, Amicus Curiae.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, J.

On July 8, 2003, Joseph Lawson, petitioner, was convicted by a jury in the Circuit Court for Prince George's County on two counts of second-degree rape, two counts of attempted second-degree rape, and two counts of second-degree assault. He was thereafter sentenced by the trial court to fourteen years in prison. Petitioner appealed the convictions to the

Court of Special Appeals challenging, among other things, the admissibility of a social worker's testimony at trial and the propriety of the prosecutor's closing arguments. On January 10, 2005, the intermediate appellate court reversed one count of second-degree rape and attempted second-degree rape, and affirmed the remaining convictions. *Lawson v. State*, 160 Md.App. 602, 632, 865 A.2d 617, 635 (2005).

Petitioner filed a petition for writ of certiorari on February 22, 2005 and we granted certiorari on May 12, 2005. *Lawson v. State*, 387 Md. 122, 874 A.2d 917 (2005). Petitioner presents the following questions for our review:

"1. Did the Court of Special Appeals err when it held that a county-employed social worker who was a stranger to the child complainant and who interviewed the child as part of a police investigation was acting 'in the course of [her] profession' under Maryland Criminal Procedure § 11–304 rather than as a law enforcement agent?

"2. Did the Court of Special Appeals err when it deemed harmless the State's impermissible and inflammatory closing arguments to the jury, even though that court recognized that the State's arguments unconstitutionally shifted the burden of proof to Petitioner, violated the prohibition on 'Golden Rule' arguments, and impermissibly suggested that Petitioner would commit similar crimes on another specific victim if he was acquitted?

"3. In a case in which Petitioner was convicted of two sexual assaults, did the Court of Special Appeals impermissibly dilute the legal definition of harmless error when it held that the erroneous admission of testimony from the complainant's mother about the second alleged incident only infected Petitioner's convictions for that incident, even though the mother's testimony also had the 'carryover effect' of bolstering the credibility of the complainant's social worker, who testified about the first alleged incident? [1]

---

1. Due to the resolution of the other questions presented for our review, we need not address this issue at this time.

"4. Did the Court of Special Appeals err when it held that an out-of-court accusation of rape by a child complainant who later testifies at trial and repudiates that out-of-court accusation is sufficient, without any independent corroboration, to convict the defendant?" [Footnote added.]

We hold that the testimony of the social worker was admissible under Md.Code (2001, 2005 Supp.) § 11–304 of the Criminal Procedure Article ("C.P."). We further hold that the cumulative effect of the prosecutor's improper remarks during closing argument and rebuttal was prejudicial, that the evidence presented did not overcome the prejudice created, and absent any attempts by the trial court to cure such prejudice the admission of the remarks constituted plain error. Finally, we hold that there was no error by the Court of Special Appeals in its corroboration ruling.

## I. Facts

Sometime in July 2002, Nigha P., a seven-year-old girl, told her mother that petitioner, a twenty-seven-year-old man, had sexually molested her. On July 15, 2002, the mother reported to the police what Nigha had told her. Two days later, Nigha was examined by a physician at the Prince George's Hospital Center. On July 18, 2002, Jennifer Cann interviewed Nigha. Ms. Cann was a social worker employed by the Prince George's County Department of Social Services. Nigha, her mother, and Ms. Cann testified for the State at trial.

Nigha's testimony at trial described two separate instances in which the petitioner molested her. The first incident occurred sometime in October or November 2001. Nigha testified that petitioner, her mother, her grandparents and her brother lived with her during that period. Nigha and her brother shared a room and slept in bunk beds. Her brother slept on the top bunk and she slept on the bottom. According to Nigha, petitioner came into her room one night while she was watching television and her brother was sleeping. He then showed her his "private part," which she described as a "big long stick." He asked her if she knew what it was and she said "I don't know." He then climbed onto the bed with

her, pulled down her pants and "tried to 'stick his private part' into hers, penetrating her 'a little bit.'" *Lawson,* 160 Md.App. at 610, 865 A.2d at 622. Nigha stated that petitioner did not put her on top of him and that he did not get on top of her. Nigha saw some "white stuff" come out of petitioner's private part. Petitioner went to the bathroom "got a rag," had Nigha clean up the "white stuff" from the floor and told her not to say anything. Nigha went to sleep after petitioner left the room. She did not tell anyone until July 2002.

The second incident took place one afternoon in June 2002. Nigha came home from school while petitioner and her brother were eating. At that time, petitioner no longer lived with them. Nigha testified that petitioner took her to her mother's room and asked her brother to look out for their grandmother. Nigha stated that petitioner told her that she could have some of his soft drink if she let him touch her in her "private part." She refused and he tried to pull down her pants. She then told him to stop and walked out of the room. Nigha testified that she did not see his "private part" that day.

Nigha's mother, Ms. Thomas, testified next. Her testimony was consistent with Nigha's account of the first incident of sexual abuse. Ms. Thomas's testimony regarding the second incident, however, was inconsistent with Nigha's account. According to Ms. Thomas, Nigha had told her that she did see petitioner's "private part" during the second incident and that he had a "plastic thing" on it.

The final witness for the State was Ms. Cann. On a pretrial motion, petitioner's counsel had argued that Ms. Cann should not be allowed to testify as to Nigha's statements to her during the interview. The pre-trial judge denied petitioner's motion. At trial, petitioner was granted a continuing objection with regards to Ms. Cann's testimony about Nigha's out-of-court statements, preserving the issue for appeal. Ms. Cann's testimony was consistent with Nigha's account of the November 2001 incident. She also testified that Nigha had told her that there were two other occasions in which petitioner had abused Nigha. According to Ms. Cann, Nigha said

that the day after the first incident, petitioner again placed his "private part" inside of hers. As to the June 2002 incident, Ms. Cann testified that Nigha had told her petitioner had pulled her pants down and, again, placed his "private part" inside hers.

After Ms. Cann's testimony the State rested. The petitioner took the stand on his own behalf and denied all the accusations against him. The defense then rested its case and both sides prepared for closing arguments. During the State's closing, the prosecutor made the following statements to the jury:

> "[State:] When I was thinking over what I was going to say to you to try to convince you that justice should be served here, I started thinking about my eight-year-old niece, and if my eight-year-old niece came to me and told me—
>
> [Defense:] Objection.
>
> The Court: Sustained.
>
> [State]: I want you to *put yourself in the shoes* if you have an eight-year-old niece, seven-year-old niece, or you have an eight-year-old daughter, seven-year-old daughter, a cousin, a close family friend, and this child comes to you and says that someone that you know sexually molested them. What would go through your minds?
>
> Well, I would urge you to think about certain things. One, motive. What is the motive here? Have you heard any motive? Did the defense give you a motive as to why Nigha would be lying?" [Emphasis added.]

The defense made a general objection which was summarily overruled. The State then implored the jurors again to place themselves in the shoes of Nigha's mother: "I urge you, *while you are putting yourself in the shoes of someone* who has had a child come to them and tell them this, what else do you look at? Well, again, you would look at details." [Emphasis added.]

The defense presented its closing argument. It was followed by the State's rebuttal, which included the following statement:

"What does a monster look like? Looks like different things to different people. What does a sexual molester look like? He looks like someone you know. He looks like your uncle, your brother, your sister, your cousin. It's possible. But there is no certain way that someone who molests children looks. But they do ingratiate themselves. They make themselves indispensable. They are friendly, always there to watch.

"Not everyone is like that, but please don't misunderstand me because the important point here is that a child molester looks like anybody else. That's why they are able to do what they do, because they look like all of us, and we trust.

"When I said that they ingratiate themselves, they make themselves indispensable. They make themselves helpful. The defendant told you, himself, he is paying for an apartment and he is not living there. He is letting an adult female cousin, *who just happens to have a little 11–year–old child,* live there." [Emphasis added.]

After closing arguments, the petitioner moved for a mistrial based only upon the admission of Nigha's mother's testimony at trial. The court did not re-instruct the jury but merely sent a written version of its instructions back to the deliberation room.

## II. Standard of Review

 We have often stated that "this Court will not reverse for an error by the lower court unless that error is 'both manifestly wrong and substantially injurious.'" *I.W. Berman Props. v. Porter Bros.,* 276 Md. 1, 11–12, 344 A.2d 65, 72 (1975) (quoting *Rotwein v. Bogart,* 227 Md. 434, 437, 177 A.2d 258, 260 (1962)); *see also Fish Mkt. Nominee Corp. v. G.A.A., Inc.,* 337 Md. 1, 15, 650 A.2d 705, 711 (1994); *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976). The reviewing court will not reverse upon rulings on evidence that do not result in prejudice to the complaining party. *Fish Mkt. Nominee,* 337 Md. at 15, 650 A.2d at 711; *Collins v. State,* 318 Md. 269, 282, 568 A.2d 1, 7 (1990), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990); *Johnson v. State,* 303 Md. 487,

528, 495 A.2d 1, 22 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *Tully v. Dasher,* 250 Md. 424, 436, 244 A.2d 207, 214 (1968). *See also Beahm v. Shortall,* 279 Md. 321, 332, 368 A.2d 1005, 1011 (1977) ("[W]hat constitutes prejudice warranting reversal in the erroneous admission or rejection of evidence is to be determined on the circumstances of each case."); *Rotwein,* 227 Md. at 437, 177 A.2d at 260. Finally, we said in *Dorsey,* 276 Md. at 659, 350 A.2d at 678, that with respect to criminal matters, an error is not harmless unless, upon an appellate court's independent review of the record, it can say beyond a reasonable doubt that the error did not in any way influence the verdict.

## III. Discussion

We must determine whether the out-of-court statements of a child to a social worker are admissible under C.P. § 11–304(c), whether the court's error in allowing the prosecution's improper closing remarks should result in reversible error, and whether a child victim's testimony of sexual abuse must be corroborated. We hold that the Court of Special Appeals was correct in affirming the trial court's admission into evidence of the social worker's testimony and finding that corroboration was not necessary but erred in determining that the closing remarks constituted harmless error.

### A. Social Worker's Testimony

The State argues, and the Court of Special Appeals agreed, that the social worker's testimony is admissible under C.P. § 11–304. That statute provides in pertinent part:

"**§ 11–304. Out of court statements of certain child victims.**

. . .

(b) *Admissibility.*—Subject to subsections (c), (d), and (e) of this section, the court may admit into evidence in a juvenile court proceeding or in a criminal proceeding an out of court statement to prove the truth of the matter asserted in the statement made by a child victim who:

(1) is under the age of 12 years; and

(2) is the alleged victim or the child alleged to need assistance in the case before the court concerning:

(i) child abuse ...;

(ii) rape or sexual offense ...; [or]

(iii) attempted rape or attempted sexual offense in the first degree or in the second degree....

(c) *Recipients and offerors of statement.*—An out of court statement may be admissible under this section only if the statement was made to and is offered by a person acting lawfully in the course of the person's profession when the statement was made who is:

(1) a physician;

(2) a psychologist;

(3) a nurse;

(4) a social worker; or

(5) a principal, vice principal, teacher, or school counselor at a public or private preschool, elementary school, or secondary school." [2]

There is no dispute as to the fact that Nigha was under the age of 12, that her out-of-court statements were being offered for their truth and that they related to an alleged rape or sexual offense. The point at issue is whether the social worker interviewing Nigha as a result of a police notification qualifies as an offeror of the statements in court under C.P. § 11–304(c)(4).

We have said that " '[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' " *Rockwood Cas. Ins. Co. v. Uninsured Employers' Fund*, 385 Md. 99, 108, 867 A.2d 1026, 1031 (2005)

---

**2.** This statute, known as Maryland's tender years statute, was enacted in 1988 and codified at Md.Code (1973, 1989 Repl.Vol.), § 9–103.1 of the Courts and Judicial Proceedings Article. In 1996, it was moved to Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 775. It is now codified as Md.Code (2001, 2005 Supp.), § 11–304 of the Criminal Procedure Article.

(quoting *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995)). Legislative intent must be sought in the first instance in the actual language of the statute. *Empire Props., LLC v. Hardy,* 386 Md. 628, 636, 873 A.2d 1187, 1192 (2005); *State v. Bell,* 351 Md. 709, 717, 720 A.2d 311, 315 (1998); *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Md. Police Training & Corr. Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater/Havre de Grace, Inc. v. Mayor of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax,* 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks,* 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck,* 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Bd. of Supervisors v. Weiss,* 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Furthermore, where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent. *Empire Props.,* 386 Md. at 636, 873 A.2d at 1192; *Williams v. State,* 385 Md. 50, 58, 867 A.2d 305, 310 (2005); *Gallegos v. Allstate Ins. Co.,* 372 Md. 748, 756, 816 A.2d 102, 107 (2003); *Resper v. State,* 354 Md. 611, 618–19, 732 A.2d 863, 867 (1999), *cert. denied,* 528 U.S. 1027, 120 S.Ct. 544, 145 L.Ed.2d 423 (1999); *Marriott Employees,* 346 Md. at 445, 697 A.2d at 458; *State v. Thompson,* 332 Md. 1, 6–7, 629 A.2d 731, 734 (1993); *Kaczorowski v. Mayor & City Council of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987). We also "construe a statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Moore v. State,* 388 Md. 446, 453, 879 A.2d 1111, 1115 (2005). In the present case, the statute is clear and unambiguous. Under the statute at issue here, testimony offered by a social worker regarding a victim's statements obtained while the social worker was "acting lawfully in the course of [her] profession" is admissible. C.P. § 11–304(c). We must determine, howev-

er, whether social workers acting upon police reports are acting in the course of their profession.

## 1. Social Work as a Profession

■ The State legislature, finding that "the profession of social work profoundly affects the lives, health, safety, and welfare of the people" of Maryland, enacted Md.Code (1981, 2005 Repl.Vol.), §§ 19–101 to 19–502 of the Health Occupations Article ("H.O.").[3] H.O. § 19–102. As a result, social workers must be licensed in order to act lawfully in the course of their profession in this State. H.O. § 19–301. It is undisputed that Ms. Cann is a licensed social worker employed by Prince George's County Department of Social Services. That a social worker is acting within the course of his or her profession when investigating alleged child abuse incidents is evident from the statutory scheme enacted for the protection of children as described below.

Title 5 of the Md.Code (1984, 2004 Repl.Vol.), §§ 5–701 to 1104 of the Family Law Article ("F.L.") was enacted "to protect children who have been the subject of abuse or neglect...." F.L. § 5–702. The legislature intended to achieve this goal in a number of ways, two of which are relevant in this case: child abuse must be (1) reported and (2) promptly investigated by the department or law enforcement agency. Any person who has reason to believe that a child has been subjected to abuse must notify the local department or law enforcement agency. F.L. § 5–705.[4] Furthermore, health practitioners, police officers, educators, and human service workers [5] *acting in a professional capacity* are specifi-

---

3. This section was originally enacted as Md.Code (1957, 1980 Repl. Vol.), Article 43, §§ 859–870A, pursuant to Chapter 852 of the Acts of 1975.

4. The statute does exclude certain individuals who have a recognized legal privilege against disclosing information. § 5–705(2), (3).

5. The definition of "Human service worker" under Title 5 includes any social worker. Md.Code (1984, 2004 Repl.Vol.), § 5–701(g)(2)(iii) of the Family Law Article.

cally required to notify the local department or law enforcement agency. F.L. § 5–704(a).

The Legislature also intended that there be a prompt investigation after the local department or law enforcement agency is notified of suspected abuse. F.L. § 5–706(a). Subsection (b) sets specific time requirements and actions to be taken:

(b) *Time for initiation; actions to be taken.*—Within 24 hours after receiving a report of suspected physical or sexual abuse of a child who lives in this State that is alleged to have occurred in this State, and within 5 days after receiving a report of suspected neglect or suspected mental injury of a child who lives in this State that is alleged to have occurred in this State, the local department or the appropriate law enforcement agency shall:

(1) see the child;

(2) attempt to have an on-site interview with the child's caretaker;

(3) decide on the safety of the child, wherever the child is, and of other children in the household; and

(4) decide on the safety of other children in the care or custody of the alleged abuser.

The Legislature again makes it clear that such steps are necessary to protect the health, safety, and welfare of children in this State. F.L. §§ 5–706(a)(1), (2). The recurring theme throughout Title 5 is the protection of the child. Social workers are acting in their professional capacity throughout the process even when they are informed of the abuse by police officers or themselves report the abuse to the police.

### 2. Admissibility of social workers' testimony in child abuse cases

We addressed the constitutionality of § 11–304 in *State v. Snowden*, 385 Md. 64, 867 A.2d 314 (2005). We found that the legislation was "enacted in response to concerns that child abuse and sexual offenses were not being prosecuted adequately due to many child victims' inability to testify as a

result of their young age or fragile emotional state." *Id.* at 76, 867 A.2d at 321. We then summarized the statutory requirements for the admissibility of such statements:

> "the Maryland Legislature imposed safeguards in the tender years statute intended to insure that any admitted statement possessed 'particularized guarantees of trustworthiness.' Md.Code (2001), § 11–304(d)–(f) of the Criminal Procedure Article. First, the statute requires that, *if the child does not testify at trial, the State must produce corroborative evidence* demonstrating that the defendant had the opportunity to commit the alleged abuse. *Id.* § 11–304(d)(2). The statute also requires that the trial court conduct a hearing to determine whether the proposed statements possess 'particularized guarantees of trustworthiness.' *Id.* § 11–304(e)–(g). The statute contains a list of non-exclusive factors that the judge must consider in making this determination.[6] *Id.* § 11–304(e)(2). The judge

---

**6.** Footnote 14 in *Snowden* states

"These factors are:

(i) the child victim's personal knowledge of the event;

(ii) the certainty that the statement was made;

(iii) any apparent motive to fabricate or exhibit partiality by the child victim, including interest, bias, corruption, or coercion;

(iv) whether the statement was spontaneous or directly responsive to questions;

(v) the timing of the statement;

(vi) whether the child victim's young age makes it unlikely that the child victim fabricated the statement that represents a graphic, detailed account beyond the child victim's expected knowledge and experience;

(vii) the appropriateness of the terminology of the statement to the child victim's age;

(viii) the nature and duration of the abuse and neglect;

(ix) the inner consistency and coherence of the statement;

(x) whether the child victim was suffering pain or distress when making the statement;

(xi) whether extrinsic evidence exists to show the defendant or child respondent had an opportunity to commit the act complained of in the child victim's statement;

(xii) whether the statement was suggested by the use of leading questions; and

(xiii) the credibility of the person testifying about the statement."

must examine the child victim in chambers, closed to all except the judge, the victim, the victim's attorney, and one attorney each for the defendant and the prosecution. *Id.* § 11–304(g). The judge must then make a finding, on the record, as to 'the specific guarantees of trustworthiness that are in the statement.' *Id.* § 11–304(f)(1). The defendant also has an opportunity to depose the health or social work professional whose testimony the State intends to offer. *Id.* § 11–304(d)(4)."

*Snowden*, 385 Md. at 76–77, 867 A.2d at 321 (emphasis added) (footnotes omitted). In order to satisfy the Confrontation Clause of the United States Constitution,[7] we interpreted these requirements in light of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We determined that if the out-of-court statements were testimonial in nature they would be inadmissible unless the declarants were unavailable or subject to *prior* cross-examination. *Snowden*, 385 Md. at 92, 867 A.2d at 330. Petitioner argues that Nigha's out-of-court statements to the social worker were testimonial.[8]

---

Md.Code (2001, 2005 Supp.), § 11–304(e)(2) of the Criminal Procedure Article. In the present case, the trial court applied these factors and found the testimony to be reliable.

7. The Confrontation Clause states: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. It has been made applicable to the States through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Snowden*, 385 Md. at 75 n. 9, 867 A.2d at 320 n. 9. Maryland's Constitution contains a similar clause in Article 21 of the Maryland Declaration of Rights, which has been construed as being *in pari materia* with the federal Constitution's Confrontation Clause. *Snowden*, 385 Md. at 75 n. 9, 867 A.2d at 320 n. 9.

8. Although petitioner does not use the term "testimonial" in his argument, he emphasizes the fact that the statements were made to an agent of the police (based on petitioner's assertion that the social worker was an agent of the police) and in preparation for litigation. In support of this argument, petitioner points to *Low v. State*, 119 Md.App. 413, 705 A.2d 67 (1998), where the Court of Special Appeals held that statements by a 12–year–old child sexual abuse victim, to a physician examining her at the request of a social worker during the investigation, were inadmissible because they did not meet the requirements of Maryland

When the declarant testifies at trial, however, a different analysis is required.[9] In *Snowden*, we held that the testimony of the social worker violated the Confrontation Clause because

"[i]n a criminal trial, the State is required to place the defendant's accusers on the stand so that the defendant both may hear the accusations against him or her stated in open court and have the opportunity to cross-examine those witnesses. In Snowden's case, the State circumvented this right, through use of the tender years statutory framework, by *having the social worker testify in place of the children.* The burden, however, is on the State, not Snowden, to prove its case through production of witnesses and evidence that conform to the U.S. Constitution and Maryland Declaration of Rights."

*Snowden,* 385 Md. at 95–96, 867 A.2d at 332 (emphasis added) (internal citations omitted). However, as Justice Scalia pointed out in *Crawford:* "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . . The Clause does not bar admission of a testimonial statement so long as the declarant is present at trial to defend or explain it." *Crawford,* 541 U.S. at 59 n. 9, 124 S.Ct. at 1369

---

Rule 5–803(b)(4). Section 11–304 did not apply because the child was 12 years of age. *Low,* 119 Md.App. at 427 n. 7, 705 A.2d at 74 (Alpert, J. dissenting). We need not determine the nature of the out-of-court statement because the declarant in the present case testified at trial, was subject to cross-examination and was cross-examined by the petitioner.

9. The mere fact that the interview was conducted after the police investigation and that the social worker was gathering information that, while primarily related to the social worker's responsibilities, could also be used as evidence in court is not determinative regarding the testimonial nature of the encounter. In *Snowden,* we determined that the statements made to the social worker were testimonial. We did so, however, after reviewing all the circumstances of that case, including the stated purpose of the interviews, the fact that the police had initiated the investigation, and more importantly the presence of the police officer during the social worker's interview. The children's awareness of such presence, we said, "overwhelms any argument that the statements were not testimonial because they were not in response to *police* questioning." *Snowden,* 385 Md. at 87, 867 A.2d at 327.

n. 9, 158 L.Ed.2d 177. In petitioner's case, the social worker did not "testify in place of the children." The declarant, Nigha, testified.[10] Lawson had the opportunity to, and did, cross-examine Nigha specifically with regards to her out-of-court statements to the social worker. We find that the social worker was acting lawfully in the course of her profession when she interviewed Nigha. Furthermore, even if the out-of-court statements were testimonial in nature (and we do not so hold), they were admissible because the declarant testified at trial. As a result, the Court of Special Appeals correctly affirmed the trial court's admission of the social worker's testimony.

## B. Prosecutor's Closing Arguments

■■■ The Supreme Court of the United States has said, and this Court has acknowledged:

> "There is no doubt that, in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused. In such cases, however, if the court interfere[s], and counsel promptly withdraw[s] the remark, the error will generally be deemed to be cured. If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since, in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation."

*Dunlop v. United States*, 165 U.S. 486, 498, 17 S.Ct. 375, 379, 41 L.Ed. 799 (1897); *Esterline v. State*, 105 Md. 629, 66 A. 269 (1907); *see also Spain v. State*, 386 Md. 145, 159, 872 A.2d 25, 33 (2005); *Degren v. State*, 352 Md. 400, 722 A.2d 887 (1999);

---

10. In *Low*, the Court of Special Appeals found that the child's testimony at trial was not sufficient because she was a reluctant witness and her testimony was vague, disjointed, and unreliable. *Low*, 119 Md.App. at 426, 705 A.2d at 73–74. In contrast, Nigha's testimony at trial was clear and coherent. Furthermore, based in part, on that testimony, the Court of Special Appeals reversed Lawson's conviction for the second incident. *Lawson*, 160 Md.App. at 620, 865 A.2d at 628.

*Leach v. Metzger,* 241 Md. 533, 537, 217 A.2d 302, 304 (1966); *Glickman v. State,* 190 Md. 516, 521, 60 A.2d 216, 218 (1948). Petitioner argues, however, that although great latitude is given during opening and closing arguments, counsel is not allowed to "appeal to passion or prejudice [ ] which 'may so poison the minds of jurors that an accused may be deprived of a fair trial.' " *Eley v. State,* 288 Md. 548, 552, 419 A.2d 384, 386 (1980) (quoting *Wood v. State,* 192 Md. 643, 652, 65 A.2d 316 (1949)); *see Wilhelm v. State,* 272 Md. 404, 414, 326 A.2d 707, 715 (1974); *Contee v. State,* 223 Md. 575, 583, 165 A.2d 889, 894 (1960).

We recently addressed the impropriety of a prosecutor's closing statements in *Spain v. State,* 386 Md. 145, 872 A.2d 25 (2005), where the defendant was charged with and convicted of distribution of a controlled dangerous substance (CDS), using a minor for the distribution of a CDS, possession of a CDS with intent to distribute, possession of a CDS, and conspiracy. The prosecution's case was supported by the testimony of the officer who arrested Spain, the drugs confiscated at the time of the arrest from another person involved, and the state's documentary exhibits. During closing, the prosecutor stated that the police officer did not have a motive to lie because

" 'The Officer in [Spain's] case would have to engage in a lot of lying, in a lot of deception and a conspiracy of his own to come in here and tell you that what happened was not true. He would have to risk everything he has worked for. He would have to perjure himself on the stand.' "

*Id.* at 151, 872 A.2d at 28. Defense counsel objected and the court overruled stating that "the jury understand[s] that this of course is closing argument, and that they will [consider the statements to be] lawyer's arguments." *Id.* In *Spain,* we were asked whether "the trial court properly exercised discretion in regulating the scope of closing argument when it allowed the State's Attorney to argue that the police officer in [that] case had no motive to lie and would risk his career by testifying falsely." *Id.* at 152, 872 A.2d at 29. We held that the court properly exercised its discretion in allowing the prosecutor to make those statements. *Id.*

In answering the question we acknowledged the "great leeway" given to attorneys during closing arguments by quoting *Degren v. State*, 352 Md. 400, 722 A.2d 887 (1999):

" 'The prosecutor is allowed liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom. In this regard, [g]enerally, ... the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the [prosecution] produces.

\* \* \*

"While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.' "

*Spain*, 386 Md. at 152–53, 872 A.2d at 29; *see also Glickman*, 190 Md. at 521, 60 A.2d at 218. We then recognized that although there are no "hard-and-fast" limitations during closing arguments, we disapproved of certain techniques such as vouching for a witness's credibility because they infringe on a defendant's right to a fair trial. But we held that "[a]lthough we agree that [some] of the prosecutor's comments transcended the boundaries of proper argument, we conclude ultimately that those statements did not mislead or influence the jury *unduly to the prejudice of Spain*, and therefore constituted harmless error." *Spain*, 386 Md. at 154, 872 A.2d at 30 (emphasis added); *see also Degren*, 352 Md. at 437, 722 A.2d

at 905 (holding that the improper remarks did not prejudice the defendant); *Leach,* 241 Md. at 537, 217 A.2d at 304 (holding that the trial judge did not abuse his discretion in denying a motion for a mistrial after the plaintiff used an improper argument at closing).

We discussed the appropriateness of assessing a witness's credibility during opening and closing arguments, why the statements vouching for the credibility of the police officer were improper, and most importantly why, under the circumstances of that case, they were not prejudicial to the defendant. We again relied on *Degren* for the standard to be used in reviewing remarks made during closing argument:

"Not every improper remark [made by a prosecutor during closing argument], however, necessarily mandates reversal, and '[w]hat exceeds the limits of permissible comment *depends on the facts in each case.*' We have said that '[r]eversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused.' This determination of whether the prosecutor's comments were prejudicial or simply rhetorical flourish lies within the sound discretion of the trial court. On review, an appellate court should not reverse the trial court unless that court clearly abused the exercise of its discretion and prejudiced the accused."

*Spain,* 386 Md. at 158–59, 872 A.2d at 33 (emphasis added); *Henry v. State,* 324 Md. 204, 596 A.2d 1024 (1991), *cert. denied,* 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992). We then considered the factors to be used during appellate review of the trial judge's decision: "the severity of the remarks, the measures taken to cure any potential prejudice, and the weight of the evidence against the accused." *Spain,* 386 Md. at 158–59, 872 A.2d at 33; *see Henry,* 324 Md. at 232, 596 A.2d at 1038 (stating that "[i]n determining whether reversible error occurred, an appellate court must take into account '1) the closeness of the case, 2) the centrality of the issue affected by the error, and 3) the steps taken to mitigate the effects of the error.' *Collins,* 318 Md. at 280, 568 A.2d at

6"). We applied these factors and under the circumstances there present, found that, with respect to the severity of the remarks, the prosecutor's statement was an isolated event that did not permeate the trial. In determining whether the harm was cured, we paid particular attention to the actions of the trial court. We recognized that the trial judge did not acknowledge that the comments were improper but he emphasized, to the jury, that they were only arguments and not evidence. We determined that his comments to the jury ameliorated the prejudicial effect of the remarks. Finally, we addressed the weight of the evidence supporting the conviction. We recognized that " '[a]nother important and significant factor where prejudicial remarks might have been made is whether or not the judgment of conviction was "substantially swayed by the error," or where the evidence of the defendant's guilt was overwhelming.' " *Spain,* 386 Md. at 161, 872 A.2d at 34 (quoting *Wilhelm,* 272 Md. at 427, 326 A.2d at 722). We found that this factor, in *Spain,* did not play a significant role because the evidence against him was not so overwhelming as to cure the effect of the statements. Additionally, we found that the statements were not so severe that their admission would deny him a fair trial. We then concluded that the lack of severity of the comments, the lack of potential impact and the court's curative steps were sufficient to uphold the conviction. We now turn to the present case.

### 1. Impropriety of the prosecutor's statements

First, we must determine what statements, if any, were improper. The petitioner argues that the prosecutor improperly addressed the jury on four different occasions. The prosecutor used a "golden rule" argument,[11] she then insinuated that the burden was upon the petitioner to prove that the child was lying, she also appealed to the jury's prejudices and fears, and finally, she alluded to the fact that

---

11. A "golden rule" argument is one in which an arguing attorney asks the jury to place themselves in the shoes of the victim. *Leach v. Metzger,* 241 Md. 533, 535 n. 1, 217 A.2d 302, 303 n. 1 (1966); *Lawson,* 160 Md.App. at 627, 865 A.2d at 632.

petitioner's conviction might prevent harm to another specific child in the future.

### a. Golden Rule argument

Petitioner points out that "[b]y asking the jurors to put themselves in the shoes of Nigha's mother . . . the State improperly appealed to the passions of the jury in order to persuade them to believe Nigha's version of events." When a jury is asked to place themselves in the shoes of the victim, the attorney improperly appeals to their prejudices and asks them to abandon their neutral fact finding role. The Court of Special Appeals recognized petitioner's argument that "such 'arguments are impermissible because they encourage the jurors to abdicate their position of neutrality and decide cases on the basis of personal interest rather than the evidence.'" *Lawson*, 160 Md.App. at 627, 865 A.2d at 632. The intermediate court found that the remark was improper, but that the general instructions to the jury before oral argument were sufficient to cure any prejudice engendered by it. *Id.*

Albeit in a civil case, the Court has addressed this specific issue in *Leach v. Metzger*, 241 Md. 533, 217 A.2d 302 (1966), a personal injury case where a husband and wife sued the driver who had collided with them. The wife was injured as a result of the crash. During closing arguments the plaintiff's attorney asked the jury to put themselves in the place of the husband. The defense attorney promptly objected to the statement and moved for a mistrial. The judge denied the motion, but instructed the jury about the impropriety of the remarks and of their duty to be "fair and reasonable." *Id.* at 536, 217 A.2d at 303. The Court recognized the problem arising from such statements and said:

> "The vice inherent in such argument is that it invites the jurors to disregard their oaths and to become non-objective viewers of the evidence which has been presented to them, or to go outside that evidence to bring to bear on the issue of damages purely subjective considerations, and resultingly courts in many other jurisdictions have deemed such 'golden rule' arguments to be improper."

*Id.* at 536–37, 217 A.2d at 304. *See also Hill v. State,* 355 Md. 206, 214, 734 A.2d 199, 204 (1999) (recognizing that "golden rule" arguments appealing to the jury's own interests are inappropriate). The Court nevertheless upheld the judgment stating that the judge had promptly and properly corrected the error by instructing the jury. *Leach,* 241 Md. at 536–37, 217 A.2d at 304. That case, however, involved only one improper statement by the plaintiff. In the case *sub judice,* the improper comments continued unabated. Moreover, there was no contemporaneous or specific curative instruction given in the present case; the trial court relied on a general instruction.

### b. Burden shifting statements

Petitioner argues that the State improperly attempted to place a burden upon him to present evidence that Nigha had a motive to lie. The Court of Special Appeals determined that the prosecutor's statements clearly asserted that petitioner had failed to present evidence rebutting the State's case. *Lawson,* 160 Md.App. at 628, 865 A.2d at 633. That court, however, found that the statements did not deny petitioner a fair trial, even if improper, because the jury instructions clearly stated that the burden was upon the State.

We stated in *Eley,* 288 Md. at 555 n. 2, 419 A.2d at 388 n. 2, that the prosecution was not free to "comment upon the defendant's failure to produce evidence to refute the State's evidence" because it could amount to an impermissible shift of the burden of proof. Later, in *Degren,* 352 Md. at 429, 722 A.2d at 901, a prosecutor during rebuttal stated: " '*nobody in this country has more reason to lie than a defendant in a criminal trial.*' " We determined that such a remark was improper, unprofessional and injudicious. We found, however, that the trial court did not abuse its discretion in allowing the comments and denying the defendant's motions for curative instructions. We reasoned that, although improper, the comment did not bear directly on the defendant's guilt or innocence. Furthermore, the comments were made in response to

the defendants closing arguments stating that the State's witnesses had various reasons to lie.

In *Shoemaker v. State*, 228 Md. 462, 468, 180 A.2d 682, 685 (1962), the prosecutor alluded to the fact that the defendant would be eligible for parole if convicted. The Court concluded that such statements tend to shift the responsibility for finding guilt or innocence onto another body after conviction. It found that it was "clear that the argument ... was improper, and that the jurors 'were likely to have been [improperly] influenced to the prejudice of the accused'...." *Id.* at 473, 180 A.2d at 688 (citations omitted); *see also Brown v. State*, 339 Md. 385, 663 A.2d 583 (1995) (holding that a prosecutor's statement insinuating that the jury could take mercy into account during deliberations was improper, that the effect of injecting such a proposition into the deliberations created the possibility that it would influence the verdict and was not harmless error).

 The primary evidence in this case was provided directly or indirectly by the victim's statements. Thus, her credibility was a major issue. The prosecutor's statements tended to shift the State's burden to prove all the elements of the crime beyond a reasonable doubt by requiring the defendant to prove that Nigha was lying. The State's statements were, therefore, inappropriate and under all of the circumstances of this case, as hereafter explained, the "jurors 'were likely to have been [improperly] influenced to the prejudice of the accused'...." *Shoemaker*, 228 Md. at 473, 180 A.2d at 688.

### c. Appealing to the Jury's fears and prejudices.

Petitioner points to the prosecutor's appeal to the juror's prejudices and fears when she made the following remarks:

"What does a monster look like? Looks like different things to different people. What does a sexual molester look like? He looks like someone you know. He looks like your uncle, your brother, your sister, your cousin. It's possible. But there is no certain way that someone who molests children looks. But they do ingratiate themselves.

They make themselves indispensable. They are friendly, always there to watch.

"Not everyone is like that, but please don't misunderstand me because the important point here is that a child molester looks like anybody else. That's why they are able to do what they do, because they look like all of us, and we trust."

Petitioner declares that such statements are designed to inflame the jurors' prejudices against a hated class of individuals and are therefore improper. The Court of Special Appeals disagreed stating that "[t]he State never directly characterized appellant as a 'monster' or 'sexual molester.'" *Lawson,* 160 Md.App. at 630, 865 A.2d at 634. The intermediate court found that the comments were isolated and that they did not affect the petitioner's right to a fair and impartial trial. In the context of this case, we disagree.

Prosecutors should not appeal to the prejudices of the jury. *Contee,* 223 Md. at 584, 165 A.2d at 894; *Hill,* 355 Md. at 211, 734 A.2d at 202. In *Hill,* the prosecution's improper remarks extended throughout the duration of the trial. The prosecutor, during opening arguments, told the jury that they were *"chosen to send a message to protect [the] community"* and to "keep[ the] community safe." *Hill,* 355 Md. at 211, 734 A.2d at 202. The defense's prompt objection to that remark was sustained. *Id.* Later, during closing arguments the prosecution again asked the jury to send a message to the community and to the defendant's cronies. The objection to that statement was overruled. After the jury commenced deliberations, a motion for a new trial based on the improper remarks was denied. The Court of Special Appeals upheld the trial court's decision based primarily upon the fact that the defense attorney failed to raise the objection before the jury was sent out for deliberations. *Id.* at 215, 734 A.2d at 204.

This Court reversed stating that the objection was not overruled due to its untimeliness but on the merits. As a result, the motion did preserve the issue for review even though it was raised after the jury retired for deliberation. The Court also found that the prosecutors statements were

"wholly improper and presumptively prejudicial...." *Id.* at 216, 734 A.2d at 205. We recognized that the defense's motion for a new trial asked for "more than just another curative instruction.... The point made was that the jury had been contaminated [ ] by the prosecutor's improper [remarks, including] ... references to the need for the jurors to convict petitioner in order to preserve the quality of their own communities." *Id.* at 219–20, 734 A.2d at 206. As a result, the prosecutor's statements prejudiced the defendant.

 The Court of Special Appeals in *Walker v. State,* 121 Md.App. 364, 709 A.2d 177 (1998), addressed the impropriety of a prosecutor's closing argument calling the defendant an "animal" and a "pervert." The court, in addressing these statements stated:

"Indeed, the nature of the evidence presented certainly gives rise to the conclusion that the actions of appellant—assuming them to be true as we must—were perverse, to say the least. When viewed, however, in the context of the totality of the prosecutor's closing argument, given such odious offenses, it is ironic that resort to excessive appeals to passion are needed to secure a conviction when the nature of the charges and the evidence adduced, without embellishment, is inherently inflammatory, albeit properly so. The right to a fair trial and the search for the truth, however, should not be hampered or obfuscated by extreme appeals to passion calculated to inflame the jury.

"When the reference to the silent screams and 'pervert' are considered *in conjunction with* the characterization of appellant as 'an animal,' we believe the prosecutor, in her zeal, exceeded the bounds of proper comment. Not only is it inappropriate to refer to a defendant in a criminal case as 'an animal,' it may be argued that such strategy, in some instances, could be counterproductive should the jury view the State as engaging in a personal contest with the defendant. It is incumbent upon the People's representative to maintain an air of dignity and stay above the frey."

*Id.* at 380–81, 709 A.2d at 185 (emphasis added). In the present case, although the prosecutor did not say "this defendant" is a monster and a child molester, it is clear that she intended to imply to the jury that he was that monster and child molester. Under circumstances such as those present here, it is not necessary for the prosecutor to specifically name the defendant, in order for the jury to understand that a defendant is the person the prosecutor is describing. Such statements are therefore inappropriate.

### d. Future criminality

 Petitioner contends that the State improperly argued that petitioner would, if allowed to roam free, sexually abuse his cousin's eleven-year-old child implying that he was already setting the child up by allowing the mother and child to live in his apartment. The Court of Special Appeals recognized that we have not addressed the issue of the allegation of future criminality in a prosecutor's closing argument. *Lawson,* 160 Md.App. at 631, 865 A.2d at 634. That court then looked at other state court opinions to guide them in their analysis. *State v. Brown,* 131 Idaho 61, 951 P.2d 1288, 1297 (1998); *State v. Williams,* 145 S.W.3d 874 (Mo.Ct.App.2004); *Williams v. State,* 261 Ga.App. 511, 583 S.E.2d 172, 177 (2003); *People v. McNeal,* 175 Ill.2d 335, 222 Ill.Dec. 307, 677 N.E.2d 841, 855 (1997). The court found that such arguments are improper because they are based upon facts not in evidence at trial. *Lawson,* 160 Md.App. at 631, 865 A.2d at 634. We agree with the Court of Special Appeals that such statements are improper, furthermore we find that such statements, under the circumstances here present, were highly prejudicial to the defendant.

### e. Summary of the effect of the improper statements

The Court of Special Appeals evaluated each of the statements standing alone and determined that each statement, independent of the others, did not merit reversal of all of the convictions, stating that "[t]he remarks at issue were unquestionably improper but, in each instance, they were short,

isolated, and vague comments and thus did not vitally affect appellant's right to a fair and impartial trial." *Lawson*, 160 Md.App. at 632, 865 A.2d at 635. Because the Court of Special Appeals did not consider the separate statements in the context of the prejudice that each of the statements, and all of them together, created in the minds of the jurors, we disagree. As petitioner argues, taken alone the statements may not affect the appellant's right to a fair and impartial trial, but their cumulative effect leads to a different conclusion. This becomes clearer as one applies the two remaining factors under *Spain:* the strength of the case and the trial court's actions.

## 2. Weight of the evidence

The evidence supporting the jury's verdict plays an important role in determining the influence of a prosecutor's improper remarks during trial. In *Spain,* there was physical evidence of the crime along with the testimony of the police officer who witnessed the event. We decided that in light of the fact that there remained sufficient evidence to convict, in spite of the effect of the improper statement—that Spain nonetheless received a fair trial. We also found that the prosecutor's remarks were not severe and that the court cured any potential prejudice. The convictions were affirmed. *Spain,* 386 Md. at 161, 872 A.2d at 34. In the present case there was less evidence than in *Spain* and the prosecutor's remarks were severe and considered cumulatively were much more prejudicial. The State's case was based primarily on Nigha's testimony and the statements she gave to her mother and the social worker. Although Nigha's mother and the social worker testified, they did so mainly as to the information that Nigha had provided to them. Their testimony contradicted Nigha's testimony as to the second incident. As a result, this was a close case where the evidence against the petitioner was less than overwhelming. There was some corroborative evidence. But, in respect to the central issue of the case, it was basically a "she said, he said" case. In our balancing analysis, this fact weighs more heavily on the side of

prejudice because there is a higher probability, in the case *sub judice* than in *Spain*, that the prosecutor's statements had an improper impact in respect to the jury's decision.

When the trial court errs in admitting such statements we have said that " 'the determinative factor ... has been whether or not the erroneous ruling, in relation to the totality of the evidence, played a significant role in influencing the rendition of the verdict, to the prejudice of the [defendant].' " *Degren*, 352 Md. at 432, 722 A.2d at 887 (quoting *Dorsey*, 276 Md. at 653, 350 A.2d at 674).

### 3. Trial court's remedial measures

The final factor under *Spain* requires us to evaluate the trial court's actions addressing the prosecutor's remarks. The first time the court had an opportunity to address these remarks was upon the objection by petitioner to the prosecutor's reference to her own niece and the insinuation to the jury that they should put themselves in the shoes of the victim. The court properly sustained that objection. The court, however, overruled the next objection to the prosecutor's comment implying that petitioner had to prove that Nigha had a motive to lie. The only other action taken by the trial court with regard to the prosecutor's remarks was one paragraph in the jury instructions based upon the Maryland Criminal Pattern Jury Instructions (MPJI–CR § 3:00) stating:

> "Opening statements and closing arguments of lawyers are not evidence in this case. They are intended only to help you to understand the evidence and to apply the law. Therefore, if your memory of the evidence differs from anything the lawyers or I may say, you must rely on your own memory of the evidence."

This instruction was given only generally and then before oral argument when it could not address specifically the objectional remarks because they had not yet been made. After closing arguments the same general written instruction was sent back with the jury without elaboration or without being identified as having any specific relationship with the prosecutor's improper remarks. The trial judge in *Spain* did use the same

instruction and we recognized the presumption that jurors are able to follow the instructions given to them by the trial court. *Spain*, 386 Md. at 160, 872 A.2d at 34. However, at the specific time the objectionable remarks were made in *Spain*, the trial court immediately responded in the presence of the jury: "Okay, well the jury understand[s] that this of course is closing argument, and that they will [consider the statements to be] lawyers' arguments." *Id.* at 151, 872 A.2d at 29. Judge Harrell responded for us in *Spain*:

> "We note also the likely diminution of prejudice from the prosecutor's comments as a result of the trial judge's *contemporaneous* reminder that they were only an attorney's argument, not evidence, . . . . By emphasizing the argumentative nature of closing arguments *contemporaneously* with the improper comments, the judge took some effort to eliminate the jury's potential confusion about what it just heard and therefore ameliorated any prejudice to the accused."

*Spain*, 386 Md. at 159–60, 872 A.2d at 33–34 (emphasis added). In the case *sub judice* there were no contemporaneous efforts by the trial judge to ameliorate the prejudice or any specific effort to cure the effects. Instead, he relied only on the general instructions he had previously given and the fact that written general instructions would go in the jury deliberation room.

We look at the trial judge's actions as a whole in reference to the statements. In *Spain*, for example, upon objection by the defense attorney to the prosecutor's comments, the trial court contemporaneously and specifically addressed the issue that the jury understood the remarks to be only lawyers' arguments and not evidence. *See Miller v. State*, 380 Md. 1, 35–37, 843 A.2d 803, 823–24 (2004) (holding that the trial court properly denied a motion for a mistrial based upon a prosecutor's comments because it properly sustained the defense's objections, granted the defense motions to strike and immediately instructed the jury to disregard the specific comments); *Dunn v. State*, 140 Md. 163, 117 A. 329 (1922) (holding that since the trial court promptly admonished the prosecutor and

told him to refrain from making improper statements, the trial court did not err when it overruled an objection and denied a motion for a mistrial). In petitioner's case the only time the judge addressed the weight or appropriateness of the prosecutor's remarks was in the general jury instructions, which at no point directly addressed the improper remarks. Thus there was no immediacy or specificity as to any efforts to cure.

Recognizing the role of the trial court in ruling upon remarks made during closing arguments this Court has stated:

> "When in the first instance the remarks of the State's Attorney do appear to have been prejudicial, a significant factor in determining whether the jury were actually misled or were likely to have been misled or influenced to the prejudice of the accused is whether or not the trial court took any appropriate action, as the exigencies of the situation may have appeared to require, to overcome the likelihood of prejudice, such as informing the jury that the remark was improper, striking the remark and admonishing the jury to disregard it."

*Wilhelm,* 272 Md. at 423–24, 326 A.2d at 720. And then in *Hill:*

> "The Court of Special Appeals will also need to take account of the persistency of the prosecutor's conduct—continuing to make these remarks time and again despite the court's rulings that the remarks were improper. A court obviously commits no error when it sustains objections to impermissible comments or gives a proper curative instruction, if that is all that is requested. There is a risk, however, when the prosecutor persistently ignores those rulings and continues in an improper course of conduct, that the jury may come to regard the court's rulings as rote window dressing and thus pay less attention to them. The number of such rulings may actually assume an inverse significance—the more of them, the less weight each or all of them will have—in which event only a mistrial may serve to remedy the error."

*Hill,* 355 Md. at 226, 734 A.2d at 210. In this case, the prosecutor's inappropriate remarks continued and when taken as a whole were highly prejudicial to the petitioner.

We hold that the cumulative effect of the prosecutor's remarks was likely to have improperly influenced the jury under the circumstances in the case at bar. The weight of the evidence was not overwhelming. The State's case relied heavily upon the credibility of the victim. The trial judge did not take sufficient steps and took no specific steps to ensure that the jury give the appropriate consideration to the statements as only being the prosecutor's arguments and not evidence. As a result, we cannot find beyond a reasonable doubt that the prosecutor's remarks were harmless. *See Dorsey,* 276 Md. at 659, 350 A.2d at 678.

The Court of Special Appeals determined that petitioner failed to preserve some of the issues for review because he only objected to two of the statements and did not move for a mistrial as to those issues at the end of closing arguments. *Lawson,* 160 Md.App. at 629–30, 865 A.2d at 633. The intermediate court then found that when an issue is not preserved, it must find that there was plain error in order to reverse the conviction. The court noted that plain error is invoked "only in instances which are compelling, extraordinary, exceptional, or fundamental to a fair trial." *Id.* (citations omitted) (internal quotations omitted); *see Miller,* 380 Md. at 29, 843 A.2d at 820; *Conyers v. State,* 354 Md. 132, 171, 729 A.2d 910, 930–31 (1999), *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *Clermont v. State,* 348 Md. 419, 455, 704 A.2d 880, 898 (1998); *Rubin v. State,* 325 Md. 552, 588, 602 A.2d 677, 694 (1992); *State v. Hutchinson,* 287 Md. 198, 202, 411 A.2d 1035, 1037 (1980). In the intermediate court's opinion, each statement when considered in isolation, was not so harmful to the petitioner as to amount to plain error.

That court erred in limiting a plain error issue to each inappropriate statement separately. Once error is determined during a "plain error" review, prejudice can only be determined by a consideration of the error in the context of the

entire case including the cumulative effect of all errors on the ability of a jury to render a fair and impartial verdict in the context of the case.

The Court of Special Appeals points to *Clermont* and *Rubin* for the proposition that this Court is reluctant to find plain error in closing arguments. *Lawson*, 160 Md.App. at 631, 865 A.2d at 635. These cases, however, are very different when compared to the case *sub judice*. They were both cases where there was ample evidence against the defendants and the arguments did not vitally affect their right to a fair trial. *Clermont*, 348 Md. at 456, 704 A.2d at 898 ("There is no basis for reversal because none of the alleged errors vitally affected Clermont's right to a fair and impartial trial."); *Rubin*, 325 Md. at 589, 602 A.2d at 695 (noting that "the improper argument is not a basis for reversal in view of the overwhelming proof of guilt"). In the present case, the primary evidence against the petitioner that the offenses occurred was the testimony of Nigha. Although her testimony alone was legally sufficient for a conviction, it might not have convinced the jury. The prosecutor's comments when taken as a whole, could have prejudiced the jury in such a way as to deny the defendant a fair and impartial trial. *See Meno v. State*, 117 Md. 435, 441, 83 A. 759, 761 (1912).

## C. Corroborating Evidence

The last question in petitioner's brief states: "Did the Court of Special Appeals err when it held that an out-of-court accusation of rape by a child complainant who later testifies at trial and repudiates that out-of-court accusation is sufficient, without any independent corroboration, to convict the defendant?" This question is moot, however, because the repudiating statement only related to the second alleged incident, and the Court of Special Appeals reversed the petitioner's conviction arising from that incident specifically because there was "[n]o medical evidence or other corroborative evidence [ ] presented that [petitioner] raped Nigha in June 2002, except, that is, for the testimony of the social worker, whose sole source of information was the same as Nigha's mother: Ni-

gha's post-incident statement which was repudiated by Nigha at trial." *Lawson,* 160 Md.App. at 620, 865 A.2d at 628. The intermediate court affirmed only the convictions relating to the first incident in October or November 2001 which was not repudiated by Nigha at trial.

Petitioner further argues that the child's in-court testimony without independent corroboration was not sufficient to support either rape conviction.[12] In support of his position, petitioner contends that although the Maryland cases recognize that corroboration is not necessary in rape cases, this Court has not explained the rationale behind that rule. Be that as it may, our cases clearly establish that corroboration evidence is not necessary when the victim testifies. *See Green v. State,* 243 Md. 75, 80, 220 A.2d 131, 135 (1966); *Johnson v. State,* 238 Md. 528, 536, 209 A.2d 765, 768 (1965); *Leek v. State,* 229 Md. 526, 528, 184 A.2d 808, 809 (1962) (per curiam), *cert. denied,* 372 U.S. 946, 83 S.Ct. 940, 9 L.Ed.2d 971 (1963); *Domneys v. State,* 229 Md. 388, 391, 182 A.2d 880, 881 (1962); *Doyal v. State,* 226 Md. 31, 34, 171 A.2d 470, 471 (1961); *Smith v. State,* 224 Md. 509, 511, 168 A.2d 356, 358 (1961); *Robert v. State,* 220 Md. 159, 164, 151 A.2d 737, 739 (1959); *Saldiveri v. State,* 217 Md. 412, 420, 143 A.2d 70, 74 (1958) (stating that the state did not need to corroborate the testimony of an eight-year-old girl rape victim); *Lusby v. State,* 217 Md. 191, 199, 141 A.2d 893, 897 (1958) (holding that the testimony of an incestuous relationship by a seventeen-year-old victim did not need corroboration). The Court of Special Appeals has recognized this rule in multiple occasions. *Moore v. State,* 23 Md.App. 540, 551, 329 A.2d 48, 55–56 (1974), *cert. denied,* 274 Md. 730 (1975) ("the victim's testimony, standing alone, if believed, is sufficient to sustain the conviction."); *Estep v. State,* 14 Md.App. 53, 70, 286 A.2d 187, 196 (1972), *cert. denied,* 265 Md. 737 (1972); *Crenshaw v. State,* 13 Md.App. 361, 371, 283 A.2d 423, 429 (1971), *cert. denied,* 264

---

12. Petitioner entered a motion for a judgment of acquittal based upon lack of corroboration at the end of the prosecutor's case in chief and at the end of all the evidence, preserving the issue for appeal.

Md. 746 (1972); *Williams v. State,* 11 Md.App. 350, 354, 274 A.2d 403, 405 (1971); *Charles v. State,* 4 Md.App. 110, 112, 241 A.2d 435, 436 (1968); *Johnson v. State,* 3 Md.App. 219, 222, 238 A.2d 295, 296 (1968); *Reed v. State,* 1 Md.App. 662, 664, 232 A.2d 550, 550 (1967) (per curiam), *cert. denied,* 248 Md. 735 (1967).

In this case, even if we were to hold that corroboration was required (and we do not so hold), there is enough corroborating evidence to support a conviction. Section 11–304(d) of the Criminal Proceedings Article provides:

"(2) If the child victim does not testify, the child victim's out of court statement will be admissible only if there is corroborative evidence that:

(i) the defendant had the *opportunity* to commit the alleged crime. . . ." (Emphasis added.)

If required, testimony showing that the defendant had the opportunity to commit the crime would be sufficient to show corroboration. In this case, the Court of Special Appeals found that Nigha's testimony was fully corroborated:

"We do note, however, that, despite the absence of a corroboration requirement in Maryland law, Nigha's testimony was, in fact, fully corroborated by the social worker's testimony as to the November 2001 incident. And Nigha's testimony, in turn, partially corroborated her social worker's testimony as to what occurred in June 2002."

*Lawson,* 160 Md.App. at 623, 865 A.2d at 630. Furthermore, petitioner admits that he knew Nigha and her family and, although he denies living with them after August of 2001, he admits that he stopped by their house and that sometimes only the children would be there. As a result, the jury could reasonably conclude that the petitioner had an *opportunity* to commit the alleged crime.

## IV. Conclusion

Section 11–304 of the Criminal Procedure Article allows social workers acting in their professional capacity to testify as to out-of-court statements given to them by children under

twelve regarding child abuse. The Court of Special Appeals correctly upheld the Circuit Court's decision to allow the social worker to testify as to the out-of-court statements in the present case.

 Prosecutors are given "great leeway" during opening and closing arguments. They must, however, remain within the bounds of the evidence presented at trial and refrain from appealing to the jury's passions or prejudices. When improper comments are made during opening and closing arguments, we give much deference to the trial court in exercising its discretion. When, however, there are multiple inappropriate statements and the trial court fails to cure the prejudice created by the cumulative effect of those statements, the admissibility of such statements may amount to more than harmless error. In this case, the trial court failed to correct the multiple inappropriate statements made by the prosecution and as a result the petitioner was denied his right to a fair and impartial trial.

In Maryland, there is no requirement to provide corroborating evidence of the abuse in respect to a child victim of sexual abuse that testifies. Should we impose such requirement, it is clear from § 11–304(d)(2) that the only corroboration necessary is that the defendant had the opportunity to commit the crime. In this case there was sufficient evidence for the jury to make such a finding.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMING CONVICTIONS OF RAPE, ATTEMPTED RAPE AND ASSAULT IS REVERSED AND THE CASE IS REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.**

Concurring Opinion by HARRELL, J., which RAKER, J., Joins.

I write separately because I am leery of the Majority opinion's approach to factoring into its closing argument "cumulative effect" analysis (Maj. op. at 589–606, 886 A.2d at 887–97) the unpreserved (and therefore waived) arguments as to the improprieties in the prosecutor's rebuttal arguments.

I have no doubt that Lawson properly preserved, by timely general objection in the trial court, his appellate ability to argue that, during the State's initial closing argument, the prosecutor improperly made "golden rule" and burden-shifting arguments. With regard to the trial court not sustaining the objection, I agree with the Majority's conclusion that that constituted error.

With equal lack of doubt, the record reveals (and the Majority opinion does not dispute) that Lawson wholly failed to object during the prosecutor's rebuttal closing arguments when she utilized the "monster" characterization and alluded to the potential for Lawson's future dangerousness with regard to his 11 year old female cousin. Moreover, when he moved for a mistrial following the State's rebuttal argument, Lawson failed to suggest that anything said in the rebuttal argument was of concern to him.[1] While these omissions may have implications in a post-conviction proceeding, the lack of objection on these points limit their consideration on direct appellate review.

There are sound, non-technical reasons for requiring, as a precursor to appellate preservation, defendants to object. *See* Md. Rule 4–323 generally. Objections alert the trial judge and permit him or her to consider the legal propriety of the particular question, piece of documentary evidence, or argument and, if appropriate, whether a curative measure may be

---

1. The impropriety *vel non* of the pertinent rebuttal arguments, as determined by the Majority opinion in the abstract (bereft as they are of timely objection), is not here disputed; it is their employment in the cumulative effects analysis by the Majority (Maj. op. at 599–601; 604–06, 886 A.2d at 893–94, 895–97) that draws my fire.

fashioned to overcome or substantially ameliorate the possible prejudice of a legal misstep. *See,* e.g., *Hall v. State,* 119 Md.App. 377, 389–90, 705 A.2d 50, 56 (1998). If that gauntlet is run successfully, there is no need for appellate relief, just as there should be no need in the vast majority of cases for appellate review of unpreserved issues.

The plain error invocation by Lawson is twofold—(1) he wants the unobjected rebuttal arguments as to the "monster" reference and his future dangerousness considered and weighed-in on their merits, and (2) he desires that his "cumulative effects" contention, which finds no roots in a trial objection or his motion for mistrial, also be reviewed on the merits. The Majority opinion, after acknowledging the same appellate criteria used by the Court of Special Appeals in evaluating whether plain error review should be undertaken and whether relief is merited ("only in instances which are compelling, extraordinary, exceptions, or fundamental to a fair trial," Maj. op. at 604–05, 886 A.2d at 895–96 (citations omitted)), dispenses with any meaningful analysis under those criteria and instead sweepingly proclaims:

> That court [Court of Special Appeals] erred in limiting a plain error issue to each inappropriate statement separately. Once error is determined during a "plain error" review, prejudice can only be determined by a consideration of the error in the context of the entire case including the cumulative effect of all errors on the ability of a jury to render a fair and impartial verdict in the context of the case.

Maj. op. at 604–05, 886 A.2d at 896.

I have two problems with this reply. First, it is uncritically dismissive of the compound non-preservation in this record. No meaningful effort is made to justify why the errors so found fit the applicable criteria. Second, although I agree with both the Majority and the Court of Special Appeals that the pertinent rebuttal arguments were improper, the failure to complain about their utterance should not be excused on direct appeal. Although the impropriety of the pertinent rebuttal arguments seems obvious, these errors, that "flew below the

radar" of trial counsel, do not strike me as worthy of characterization, in and of themselves, as compelling, extraordinary, exceptional, or fundamental to a fair trial. Accordingly, I would not factor the rebuttal arguments into an analysis of whether reversal in this case should result.

Yet, I would reverse based on the preserved errors from the State's initial closing arguments, for much of the same reasons marshalled by the Majority opinion in its cumulative effects analysis. This should have been a close case at trial. Basically, it came down to Nigha's credibility versus that of Lawson. The mother and the social worker merely repeated what Nigha told them. Even then, Nigha's trial version of the second encounter was inconsistent with what the mother and social worker informed the jury that Nigha told them. There was also the matter of the additional accostings the social worker said Nigha told her about, but which did not figure in Nigha's trial testimony or what her mother testified Nigha told her. On such a record, I am unable to state, beyond a reasonable doubt, that the improprieties in the State's initial closing influenced the verdict in no way.

I have no quarrel with the balance of the Majority opinion or the judgment.

Judge RAKER authorized me to state that she joins this concurrence.